CENTER ON CORPORATE RESPONSIBILITY, INC., Plaintiff,

v.

George P. SHULTZ et al., Defendants.

Civ. A. No. 846–73.

United States District Court,
District of Columbia.

Dec. 11, 1973.

As Amended Dec. 12, 1973.

---

John H. F. Shattuck, Norman Dorsen, Melvin L. Wulf, New York City, for amicus curiae, American Civil Liberties Union.

Scott P. Crampton, John J. McCarthy, Richard M. Roberts, Donald J. Gavin, Harold H. Titus, Jr., Washington, D. C., of Counsel for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on Cross Motions for Summary Judgment. The Plaintiff seeks a refund of $13.16 in employment taxes paid in the first quarter of 1973 on the ground that the Plaintiff is a charitable and educational organization described in section 501(c)(3) of the Internal Revenue Code of 1954 [1] which is exempt from income tax under section 501(a) of the Code. The Plaintiff also seeks to enjoin the Defendants from refusing to rule that the Plaintiff is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code and qualified to receive deductible charitable contributions under section 170(c)(2) of the Code. For the reasons discussed below, the Court finds that the Plaintiff is entitled to a refund of employment taxes for the first quarter of 1973 on the grounds that its activities and purposes entitle it to section 501(c)(3) recognition and qualify it to receive deductible contributions under section 170(c)(2). The Court also finds that in light of the special and extraordinary circumstances of this case and the Supreme Court's standard in Enochs v. Williams Packing Co., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), the Plaintiff is entitled to the injunctive relief that it seeks.

Thomas A. Troyer, H. David Rosenbloom, Richard W. Skillman, Washington, D. C., for plaintiff.

1. 26 U.S.C. § 501(c)(3). All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Sec. 501(c)(3) provides: "Corporations . . . organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

## I. BACKGROUND OF THE CASE

### A. *History*

The Plaintiff was incorporated under the laws of the District of Columbia as a non-profit corporation on February 19, 1970, under the name "Project on Corporate Responsibility, Inc." Its purpose was to engage in and conduct educational and charitable activities on a non-profit basis to improve and better the conditions of American life and institutions by promoting the development of increased responsibility and awareness on the part of corporate entities and decision-makers to use the corporate institution and power to better the social welfare, particularly in the areas of minority group problems and employment discrimination, pollution, and utilization and conservation of national resources —economic, human, natural and otherwise.

On September 3, 1970, the Plaintiff filed an Application for Exemption under its former name, "Project on Corporate Responsibility, Inc." The Plaintiff sought an Internal Revenue Service ruling that it was exempt from federal income taxes as a charitable and educational non-profit corporation under § 501(c)(3) and thus entitled to receive deductible contributions under § 170 (c)(2). During the process of considering the Plaintiff's application, the Defendants' representatives posed questions regarding the Plaintiff's activities, to which the Plaintiff responded by submitting supplemental information on April 16, 1971, June 2, 1971, August 18, 1971, August 18, 1972, September 27 and October 24, 1972.

The responses of August 18, 1972, and thereafter followed a June 9, 1972 conference with the Defendants' representatives who informally expressed the view that the Plaintiff would qualify as a tax exempt organization if the Plaintiff would cease to participate in its proxy contest activities. As the Plaintiff had a pressing need for an expeditious and favorable ruling by the Service, its attorneys informed the Defendants' representatives that the Plaintiff would comply with all of the Defendants' requested or suggested modifications in order to obtain one. In response to the view expressed at the conference, the Plaintiff altered its corporate name [1a] and charter, and undertook to conduct only those activities which the Defendants' representatives informally indicated would be in full compliance with exempt status under section 501(c)(3).

The Plaintiff's amended application stated its activities would continue to focus both on corporate involvement in various social problems and conditions, and on the social impact of various corporate policies, but that after August 18, 1972, these purposes would be realized entirely by sponsoring and performing research, conducting educational programs, issuing publications, conducting public interest litigation and other such related activities which the IRS employees indicated were clearly consistent with exempt status. All future proxy contest activities would be undertaken by the Plaintiff's sister organization, the Project on Corporate Responsibility, Inc.[2]

---

**1a.** This is how the Plaintiff, in the instant case, came to have its name, Center on Corporate Responsibility, Inc. The new "Center" (Plaintiff) agreed to limit its activities and scope of its charter to conform to IRS objections.

**2.** This sister organization had likewise changed its name from "Project on Corporate Responsibility Action Council, Inc." It was designed to be an independent, self-supporting, non-exempt entity. It had its own bank accounts and paid expenses from them.

Its purposes were identical with those of the Plaintiff; its methodology for achieving those purposes was different in a few respects. The Project shared office space and some personnel with the Plaintiff, evidently with the arrangement that it would reimburse the Plaintiff for an allocable share of the shared expenses. The Project's Board of Directors consisted of four individuals also staff members, who also served on the Plaintiffs' sixteen-member Board of Directors.

From August 18, 1972, through May 1, 1973, Plaintiff's counsel repeatedly asked employees of the IRS whether there were any further steps which the Plaintiff might take to secure a prompt and favorable ruling. Although the Plaintiff had been informally told that it would be advised if a need to take such steps arose and that it would be accorded a conference with IRS employees should the IRS contemplate a negative ruling, the Plaintiff was never contacted nor advised of any defect in its application. On May 2, 1973, the Plaintiff filed this lawsuit.[3] On May 16, 1973, the Service issued a ruling that the Plaintiff was not exempt from federal income taxes under section 501(c)(3) and not qualified to receive deductible charitable contributions under section 170(c)(2).

On June 29, 1973, Plaintiff's counsel sent the Court a letter listing several indicia that White House influence may have been used to induce the IRS to enter the unfavorable ruling even though the Service had given all indication that it would enter a favorable ruling. Plaintiff's counsel pointed to: (1) The testimony of John W. Dean III before the Senate Select Committee on Presidential Campaign Activities, in which Mr. Dean submitted several memoranda dated in August and September, 1970 and in the fall of 1971 which indicated that attempts were made to use IRS administrative actions against tax exempt organizations, described as "left wing" or "activist," whose views the White House found offensive;[4] (2) the extreme delay, two years and eight months, in processing the application, and the fact that the ruling was finally rendered only after this suit was instituted, and the fact that the final ruling was totally contrary to the views expressed by the IRS representatives at the June 9, 1972 meeting; and (3) the fact that Mr. Roger V. Barth, Deputy Counsel of the Internal Revenue Service, a political appointee and addressee of one of the memorandum described in (1) *supra*, was in charge of processing the ruling request in its concluding stages, despite the fact that he had no ordinary responsibility for the ruling processes, no special background in tax exempt organizations law, and had performed a number of functions for the White House at the Internal Revenue Service.

In response to this letter the Court held a hearing and entered an order on July 6, 1973 allowing the Plaintiff to conduct discovery on the question of political intrusion or influence in the processing of the Plaintiff's application. The Order allowed for depositions, interrogatories or the production of (1) IRS documents and files which pertained in any way to the Plaintiff's application for an exempt ruling, which were not privileged; and (2) all documents, memoranda, and other writings in the White House's possession on June 29, 1973, relating to the Plaintiff or which mentioned the Plaintiff and which were not privileged. The Defendants were further ordered to give the Plaintiff prompt access to all materials within the scope of the July 6 Order.

Pursuant to this Order, the Plaintiff was allowed to inspect the IRS files relative to the Plaintiff's application for exemption and copy those documents which showed some form of impropriety, if the Defendants agreed the documents

---

3. On August 8, 1973, the complaint was amended to join the United States as a party Defendant and to seek a refund of first quarter 1973 Social Security taxes paid with respect to one of the Plaintiff's employees. The Plaintiff had filed its request for a refund of Social Security taxes on July 11, 1973. The Defendants handled the matter on an expedited basis and denied the request on July 27, 1973.

4. The four memoranda which Mr. Dean submitted to the Senate Select Committee on Presidential Campaign Activities (Hereinafter, the Ervin Committee) were reprinted in the *Washington Post*, June 28, 1973, p. A–20. During his testimony, Mr. Dean referred to other papers in his file though not then in his possession, which could provide further evidence on this issue. *See, New York Times*, June 30, 1973, p. 16, and June 29, 1973, p. 25.

showed some impropriety.[5] While inspecting the file, the Plaintiff discovered seven pages of hand-written notes by Mr. Richard Cox [6] with the notation *"perhaps White House pressure."*

The files also disclosed certain unusual procedures in the final processing of the application.[6a] Since the Internal Revenue Service's principal concern with the Plaintiff's application was a novel question—whether the Plaintiff's proxy contest activities in pursuance of a charitable purpose disqualified it from exempt status, the IRS referred the Plaintiff's application through channels to the Interpretative Division of the Chief Counsel's Office. Thereafter IRS notified the Plaintiff that it was considering an unfavorable ruling because of the Plaintiff's proxy contest activities. The Chief Counsel scheduled the conference of June 9, 1972 referred to *supra* to discuss the proposed ruling. At the conference, the Plaintiff's representatives indicated they would eliminate the Plaintiff's participation in the proxy contests and would limit its activities to those which the IRS representatives indicated were compatible with exempt status—educational activities, research, and public interest litigation in the area of corporate social responsibility, within the meaning of the public interest law firm guidelines set forth in Revenue Procedure 71–39, 1971–2 C.B. 575. Following submission of additional information which indicated compliance with the IRS representatives' requested modifications, a favorable ruling letter was drafted in the fall of 1972 by the Rulings Section of the Exempt Organizations Branch and referred to the conference and Review Staff of the Exempt Organizations Branch. At this point in time, all disqualifying aspects of the Plaintiff's

former operations had been eliminated and the "novel" question the case presented was moot, and the Plaintiff was in compliance with IRS standards for exempt status.

Having learned that a favorable ruling was contemplated for the Plaintiff, on January 16, 1973, Mr. Lee H. Henkel, Chief Counsel of the Internal Revenue Service, requested to see the file before such a ruling was issued. Pursuant to this direction the Exempt Organization Branch forwarded the Plaintiff's file again to the Interpretative Division of the Chief Counsel's Office. Upon completion of the review there, the file was forwarded to the Deputy Chief Counsel and Mr. Henkel on February 20, 1973, with a memorandum stating unanimous approval of the proposed favorable ruling. The memorandum also stated that the Plaintiff was willing to make any further changes to be in compliance with exempt status requirements.

Between the date of this memorandum and the date of this suit the file contains no indication of any differing opinion within the IRS concerning the application nor of a reconciliation conference, which would have been the normal procedure where there is a ruling entered which is contrary to the one recommended. Also during this time, the Plaintiff's attorney, although he contacted the IRS frequently on the application's status, was never informed of the need to make any changes in the Center to resolve any legal problems the IRS may have encountered. Following the institution of this suit, a General Counsel's Memorandum, stating an adverse position regarding the application was prepared by the Chief Counsel's Office. An adverse ruling letter was issued to the Plaintiff on May 16, 1973.[7]

---

5. Hearing July 10, 1973, transcript pages 24–25. In the event the Defendants did not agree that the records showed some impropriety, they said they would submit the records to the Court for an *in camera* inspection.

6. The Assistant Director of the Interpretative Division.

6a. See affidavit of Sheldon Cohen, former Commissioner of the Internal Revenue Service, attached to the Plaintiff's Motion for Summary Judgment.

7. The ruling stated that it was based in part on a document published by the Center, but which was obtained from a third-party. The IRS never contacted the Plaintiff prior to

It appears that during the period of inactivity (February 20–May 2, 1973), the file was referred to Mr. Roger V. Barth, then Deputy Chief Counsel and a political appointee. About April 25, 1973, Mr. Barth referred the file to a Mrs. June Norris, then employed in the Office of the Director of the Miscellaneous and Special Provisions Tax Division, under the Assistant Commissioner (Technical). Although she had neither direct or indirect responsibility to the Chief Counsel, nor any prior involvement regarding the application, it was Mrs. Norris, who working on her own time, at home, prepared by May 1, 1973, the draft of an adverse ruling approximately 80 pages in length. The draft appears to have been the basis in part for the adverse ruling ultimately issued by the IRS.[8]

On July 31, 1973, the Plaintiff ceased all operations. Its operations had been on a curtailed basis prior to this.

B. *Discovery on the Issue of White House Interference in Internal Revenue Service's and Treasury Department's Considerations of Tax Exempt Organizations.*

The question of political influence or political considerations intruding into the Internal Revenue Services' consideration of the Plaintiff's exemption application has loomed large in this case. The Plaintiff submitted eight interrogatories regarding this issue on May 16, 1973. The Defendants had not responded by July 6, 1973. On that date, the Court issued its general discovery order, ordering that the Plaintiffs be allowed prompt access to all documents and files of the Internal Revenue Service "in any way appertaining to" the Plaintiff's application for exemption and all documents, memoranda and other writings in the possession of the White House relating to the Plaintiff. The Court's Order was prompted by specific indicia of White House interference in the IRS' decisions, which were brought to the Court's attention in the Plaintiff's letter of June 29, 1973, *supra* at 867.

At a hearing on July 18, 1973, on the Motion to Compel Answers to the Plaintiff's Interrogatories,[9] the Court specifically indicated the breadth of the search it wanted the Defendants to undertake regarding this issue.[10]

Subsequent to the Court's Order the Defendants conducted two separate searches of the "White House Files." The first by Bruce A. Kehrli, who stated in an affidavit that his search had failed to reveal any materials in the files and records of the White House relating to or mentioning the Plaintiff. The Plaintiff's deposition of Mr. Kehrli, taken July 17, 1973, indicated that his search was limited not only regarding the particular files he investigated but also in the scope of the subject matter of his search.[11]

the ruling to obtain any explanatory information about the document. See footnote 22, *supra*.

8. Deposition of June B. Norris, pp. 5–7, 9, 11, 35–36, deposition of Arthur B. White, pp. 18, 20, 24, 40–43. The Chief of the Ruling Section, Exempt Organizations Branch, filed a dissenting opinion to the adverse ruling letter.

9. The Defendants answered the interrogatories on July 16, 1973, but the answers were based wholly upon the personal knowledge of Donald C. Alexander, who had been a private attorney in Cincinnati during the period covered by the Interrogatories, and upon the formal records of the IRS. The Court entered an Order that the answers to the interrogatories be based on the personal knowledge of those IRS employees who participated in the considerations of the Plaintiff's application. The Defendants did not meet the deadline date in this Order, nor the deadline set at the July 25, 1973 hearing, nor did the Defendants ask the Court's permission for an extension of time.

10. Transcript of Hearing, July 18, 1973, at 48–49, 58.

11. The search failed to include the files of John Dean, Charles Colson, H. R. Haldeman, John Erhlichman, John Caulfield and others whose files would reasonably be within the scope of the search. The subject matter of the search appears to have been limited to those documents which mentioned the Plaintiff. Mr. Kehrli also indicated in his deposition that he was significantly igno-

The second search was conducted under the direction of J. Fred Buzhardt, Special Counsel to the President.[12] His search revealed only four documents which fell within the scope of the Court's Order. These he submitted to the Court for its *in camera* inspection. In his affidavit describing his search,[13] Mr. Buzhardt stated that he searched the central and special files of the White House for (1) writings relating to or mentioning the Plaintiff, the Project on Corporate Responsibility, or Campaign GM, and (2) writings "relating to White House interest in the tax exempt status of left-wing activist organizations." [14]

On October 2, 1973, the Court entered a Show Cause Order to determine why the Sanctions of Rule 37 of the Federal Rules of Civil Procedure should not be applied against the Defendants for their failure to comply with the Court's Order of July 6. In the October 2 Order the Court specifically stated that included within the scope of the July 6 Order were "materials referring to White House interest in, concern with, or in-

tervention in the decisions or actions of the Internal Revenue Service or the Treasury Department on tax-exempt organizations, including the granting or withholding of tax exemption rulings or the conducting of audits from January 20, 1969 to the present date." The Defendants responded that they had complied with the Court's July 6 Order in that they had provided the access to the IRS Files which in any way pertained to the Plaintiff.[15] The Defendants' affidavit stated further that a search of all Treasury and IRS files regarding tax-exempt organizations since January 20, 1969 would be burdensome. The Defendants referred to Mr. Buzhardt's affidavit as its response to the Order regarding the search of the White House files for materials pertaining to the issue of political intervention.

The two remaining aspects of the October 2 Order required the production of the tape recording of the meeting between the President, John Dean and H. R. Haldeman [16] regarding the use of tax-

---

rant of the White House filing system (see Deposition at 8, 35, 36, 41, 42, 43–45, 46–47, 48, 51, 52, 55, 57, and 60), yet he was the representative that the Defendants sent in response to a Deposition Notice directed to: White House Custodian of Documents.

12. A letter, dated Aug. 8, 1973, from Richard M. Roberts, Deputy Assistant Attorney General, Tax Division, informed the Court that Mr. Buzhardt would conduct a search of the White House files but that it would be limited to White House interest in left-wing activist organizations or tax-exempt organizations as a whole.

13. The affidavit was attached to the Defendants' response to the Court's October 2 Order to Show Cause.

14. In describing his search of the impounded White House files of Charles W. Colson, John D. Ehrlichman, H. R. Haldeman, John N. Mitchell, Maurice H. Stans, John W. Dean, III, and John J. Caulfield, Mr. Buzhardt stated he searched these files "for documents" relative to the Plaintiff, to the Project on Corporate Responsibility, or to Campaign GM, or which mention the Plaintiff, the Project on Corporate Responsibility, Campaign GM, or "documents" relating to White House interest in the tax-exempt sta-

tus of left-wing activist organizations, or tax-exempt organizations, and found no documents so relating. Mr. Buzhardt limited his search of these files to "documents," while his search of the other files included "any documents, memoranda or other writings" as the Court's Order specifically required of all searches.

15. In its opposition to the Defendants' Response to the Show Cause Order, the Plaintiff stated that the Defendants' sole response to two notices to produce Treasury and Internal Revenue Service Documents and other material indicating White House intervention in the actions of the Treasury Department of the Internal Revenue Service on tax-exempt organizations, was to furnish several pages of the already public Internal Revenue Service Manual and to deny access to any of the other items sought on the grounds that production would be excessively burdensome. See Plaintiff's Reply to Defendants' Response to Order to Show Cause, filed Oct. 17, 1973, at 14.

16. The Court's Order applied to the tape of the conversation between the President, Mr. Dean and Mr. Ehrlichman. Mr. Buzhardt's affidavit states that the conversation of September 15, 1972, to which Mr. Dean re-

ing mechanisms against White House "enemies" and whether the White House would claim executive privilege regarding any of the requested documents, memoranda or writings. Mr. Buzhardt's affidavit stated that he had reviewed the transcripts of the Watergate Hearings (Ervin Committee) and said that the hearing transcripts did not indicate that the conversations "related to tax-exempt organizations or organizations claiming tax-exempt status." Mr. Buzhardt stated further that he was "authorized to advise the Court that the White House is claiming executive privilege" as to both the tape recording and the four documents submitted for *in camera* inspection.

## II. THE COURT WILL IMPOSE RULE 37(b)(2)(A) F.R.C.P. SANCTIONS AGAINST THE DEFENDANTS FOR THEIR FAILURE TO COMPLY WITH THIS COURT'S DISCOVERY ORDERS

 A looming issue in this case has been whether political interference or intrusion has played a role in the Internal Revenue Service's consideration of the Plaintiff's exemption application.[17] Should this specter prove to have substance, the complexion of this case changes. A showing of political influence renders the Service's ruling null and void. It is outside the law.

The Court is concerned not only with direct political intervention, but also with the creation of a political atmosphere generated by the White House in the Internal Revenue Service which may have affected the objectivity of those participating in the ruling in the Plain-

tiff's case. The inference of political intervention has been unmistakenly raised: (1) by the handwritten memo in the Plaintiff's file indicating *"perhaps White House pressure"*; (2) by John Dean's testimony before the Ervin Committee; (3) by the memoranda Mr. Dean submitted to the Ervin Committee; (4) by the testimony of Patrick J. Buchanan, White House Staff Member, before the same committee (September 27, 1973); [18] (5) by the Deposition of Roy Kinsey, Assistant to Mr. Dean, (July 30, 1973, at 10–18); and (6) by the four documents submitted for *in camera* inspection. These indicia of political intervention, combined with the unusual and protracted processing of the Plaintiff's application, have triggered a warning signal requiring the Court to fully investigate the issue. Through its Discovery Orders, the Court has endeavored to obtain all the information necessary to make an informed evaluation of the issue. However, the time has come for the Court to make that evaluation, and the Court is without the requested materials to do so.

The Defendants have failed to comply with the Court's Order of July 6. Within the scope of the Order were all White House files plus the Treasury and the IRS files regarding tax-exempt organizations since Jan. 20, 1969, and certain tape recordings now before Judge Sirica.

Neither of the two searches of the White House files met the scope of the Order. The first was limited solely to materials in the White House files which mentioned the Plaintiff. In addition, Mr. Kehrli's affidavit regarding the first search of "all White House

---

ferred, was between the President, Mr. Dean and Mr. Haldeman, not Mr. Ehrlichman.

17. ". . . Moreover, notwithstanding the stated grounds for the May 16 ruling, Plaintiff in fact was denied a favorable ruling because it was singled out for selective treatment for political, ideological and other improper reasons which have no basis in the statute and regulations." Plaintiff's Amended Complaint, para. 21, second sentence.

18. Mr. Buchanan's testimony referred to a memorandum from himself to the President, dated March 31, 1971, which discussed the Administration's intent to use the IRS to combat those "anti-Administration institutions like the Stern Foundation." *See, New York Times*, September 27, 1973, p. 31.

files" was misleading. As his deposition indicates, he did not in fact search all of the White House files. He did not search the impounded files of Messrs. Colson, Ehrlichman, Haldeman, Dean or Caulfield.

The second time, the Defendants limited the search to documents, memoranda or writings in the White House central and special files which either related to or mentioned the Plaintiff or related to "White House interest in the tax-exempt status of left-wing activist organizations." Mr. Buzhardt's affidavit indicated that he conducted a complete search of the files which produced four documents which he submitted for in camera inspection.[19] Mr. Buzhardt's complete search, however, failed to produce the documents, memoranda, and writings relating to this issue which were specifically referred to by Mr. Dean and Mr. Buchanan in their Ervin Committee testimony and by Mr. Kinsey in his deposition.

As to the Defendants' duty to search the Treasury and IRS files, they have simply replied that the Order is "excessively burdensome." They made no request for a protective order. They provided no objective facts to support their claim, which would have allowed the Court to treat the reply as a form of protective request and determine if there was "good cause" under Rule 26(c), F.R.C.P., to limit the scope of the search.

In addition to failing to comply with the Court's general discovery orders, the Defendants have failed to comply fully with the Court's Order Compelling Answers to Interrogatories in either substance or in deadlines. The Court can only consider this is another example of the Defendants' efforts to evade the Court's orders. Considering both the necessity for the information sought in the discovery orders and the fact that the Defendants have sole possession of that information, failure to comply with the orders is grounds for imposition of Rule 37(b), F.R.C.P., sanctions. See, Campbell v. Eastland, 5 Cir., 307 F.2d 478, 491–492 (1962), cert. denied, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502.

■■ There is one other facet of the Defendants' Response to the Court's Show Cause Order which concerns the Court. The tape [19a] of the conversation between the President, Mr. Dean and Mr. Haldeman regarding the use of the IRS against White House "enemies", will not be produced because of "executive privilege." Mr. Buzhardt's affidavit states that he is "authorized to say that the White House was claiming "executive privilege" as to any and all tapes as well as the four documents submitted for the Court's in camera inspection. Evidently this single statement is intended to be a claim of executive privilege. United States v. Reynolds (1954), 345 U.S. 1, at 7–8, 73 S.Ct. 528, 97 L.Ed. 727, requires that a valid claim of executive privilege can be made only by the head of the agency which has custody of the documents in issue. Wright & Miller, Federal Practice and Procedure, Civil

---

19. The four documents demonstrate that the White House staff did in fact consider using the IRS against their "enemies." This conduct is at best reprehensible. The Court finds that the documents contain information relevant to this action, and are discoverable. The Court has summarized the reasons for this finding in a statement which it has submitted to the U. S. Court of Appeals for the District of Columbia Circuit for their in camera review pursuant to their direction at page 39 in Nixon v. Sirica, 487 F.2d 700, Nos. 73–1962, 73–1967, 73–1989, D.C.Cir., 1973. See Appendix for statement of rea-

sons. Should the Court of Appeals' requirement for a sealed review apply solely to that suit and not to the circumstances of this case, the Court shall make the documents part of the record sua sponte.

19a. The October 2 Order ordered the production of the tape of the conversation on September 15, 1972 between the President, John Dean and John Erhlichman. Mr. Buzhardt's affidavit informed the Court that the taped conversation of that date was between the President, Mr. Dean and H. R. Haldeman.

§ 2109 (1970). The President, as head of the "agency," the White House, must make the formal claim. A mere statement by Mr. Buzhardt that he is authorized to advise the Court that the White House is claiming executive privilege is wholly insufficient to activate a formal claim of executive privilege. *See,* Nixon v. Sirica and Cox, 487 F.2d 700, p. 704 Nos. 73–1962, 73–1967, and 73–1989, D. C.Cir., 1973, in which the President himself asserted the privilege. Thus the Defendants have again failed to comply with the Court's Order without a proper claim of executive privilege. This is also grounds for imposing Rule 37(b) sanctions. *See,* O'Neill v. United States, 79 F.Supp. 827, 830 (E.D.Pa.1948), vacated on other grounds sub nom., Alltmont v. United States, 174 F.2d 931 (3rd Cir. 1949), cert. denied, 339 U.S. 967, 70 S.Ct. 999, 94 L.Ed. 1375 (1950).

■ Therefore, since the Defendants have failed to comply with the Court's discovery orders, have failed to make a proper claim of executive privilege, and have otherwise delayed and hindered the discovery of information solely in their possession and crucial to a key issue in the case, under the authority of Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, the Court will grant Plaintiff's request for sanctions, and order, that for the purposes of this case, the statement in the second sentence of paragraph 21 of the Plaintiff's Amended Complaint (see footnote 17) will be deemed established.

The establishment of this fact nullifies the validity of the Service's ruling of May 16. Furthermore, as Section III will demonstrate, the grounds upon which the Service based its denial of exemption are legally unsound. The Plaintiff has met all the requirements for exemption status and would have been entitled to a favorable ruling even if the fact of political intervention had not been established.

## III. THE PLAINTIFF IS AN ORGANIZATION EXEMPT FROM TAX UNDER SECTION 501(c)(3) OF THE INTERNAL REVENUE CODE OF 1954, AND IS THEREFORE ENTITLED TO A REFUND OF F.I.C.A. TAX PAID FOR THE FIRST QUARTER OF 1973.

■ The Plaintiff is entitled to a refund of its employment taxes (or for this matter, entitled to exemption from all taxes) as it meets the requirements of an organization described by Section 501(c)(3) of the Code. Section 1.-501(c)(3)–1(a)(1) of the Income Tax Regulations requires that in order to be exempt as a 501(c)(3) organization, the organization must meet two criteria. It must be both organized and operated exclusively for one or more of the purposes specified in the section. Elaborating on these two criteria, the Tax Regulations state that the organizational test is met if the articles of the organization: (a) limit the purpose of the organization to one or more exempt purposes; and (b) do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes. The operational test—"operated exclusively" for one or more exempt purposes—is met if the organization engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). If more than an insubstantial part of its activities is not in furtherance of an exempt purpose, then, the operational test is not met. Exempted purposes include charitable and educational activities as described by Regulation Sections 1.-501(c)(3)–1(d)(2) and (3) respectively.

It is apparent, after reading the lengthy papers filed in this case, that the real question concerning the Plaintiff's status as an exempt organization, is whether its activities meet the operational test. The Defendants have never challenged the articulated purposes of the organization in either their May 16

ruling letter or in their Motion for Summary Judgment and supplemental memoranda. Despite the many forms the Defendants' challenge to the exemption take,[20] the substance boils down to the Defendants' belief, or fear, that the Plaintiff will continue to participate in corporate proxy contests, with the Internal Revenue Service's encouragement or assistance by means of a tax-exempt status.

In its ruling letter of May 16, the Service's *sole* basis for denial of the exemption was the Plaintiff's alleged involvement in proxy contests. The Service set out at length its belief that proxy contests are not charitable activities.[21]

20. Although the Defendants maintain otherwise, the precise grounds for the denial of exemption have changed since the ruling letter.

21. See May 16, 1973 Ruling Letter T:MS:EO:R:3, EIN 52-0899187 DO 52, et 33 (bottom) through 41.

In its discussion of whether proxy contests are charitable activities and thus meet the operational test, the Service maintained that charitableness must be governed by legal standards, Regulations § 1.501(c)(3)-(d)(2). The legal standard is "community benefit." Ruling Letter at 39. In the Defendants' own words, the determination of "community benefit" "turns not on . . . any hard and fast formulas as to what is beneficial to the community, but on whether the courts regard or would regard the particular benefit to the community, as sufficient to outweigh or warrant the detriments entailed in devoting property to such use in perpetuity, relieving it of the burden of taxation, etc. Bogert, Trusts and Trustees (2d ed. 1964) § 368, 369." *Id.* at 40.

In its abstract analysis of the problem, the Service determined that to be charitable proxy contests would have to fit the educational activity mold. It conceeds that it has long been accepted that the promotion of social change or objectives by educational means is charitable. *Id.* at 34. The Service drew a distinction, however, between educating the general public as to the procedural means of achieving objectives which stockholders may deem desirable in respect to corporate management policies, and the outright devotion of resources to direct participation in the processes of corporate management. The Service saw the former as educational and the latter in two ways. First, as a force disruptive of "the balance of economic interest of stockholders comprising the ownership of a corporation with possible adverse consequences in the field of corporate ownership." *Id.* at 38. At the minimum, the Service found "subsidization of ownership-management negotiations through use of charitable resources in proxy contests on stockholder proposals as an independent charitable objective (distinguished from ordinary investor participation on corporate management), . . . injects an additional economic element into the corporate relationship." *Id.* at 38. Secondly, the Service saw proxy contests as business processes designed for management of an individual corporation's business. The Service decided, therefore, that in the abstract proxy contests had no "community benefit," no matter what the ultimate objective of their use may be. *Id.* at 39. The Court is quisical as to the relevance of the Service's first view, in determining whether the proxy contests are permissible activities for achieving charitable purposes.

In analyzing the charitable nature of proxy contests in the instant case, the Service examined the subject matter of corporate management issues that could be raised in the context of the public interest proxy programs. *See, id.* 35-37. The Service asked what nexus there was between "such issues and the claimed social results and charitable goals asserted as the real objective accomplished or sought to be accomplished by the raising of the issues." *Id.* at 37.

Although the question is now surplusage since the Plaintiff can no longer (nor has it) participate in proxy contests, the answer, nevertheless, is patently obvious. The Plaintiff's purpose is to make corporate management, and thus corporations, responsible. *It is only reasonable that corporations begin to realize that they have duties beyond simply making money for their stockholders. A corporation does not exist in a vacuum, but is part of the community, for better or for worse. In the past, it has been for worse.* Large corporations have contributed to many of the social problems affecting the community both directly, in hiring practices, effects on the environment, non-compliance with regulations, indifference to the consumer safety, etc., and indirectly, through use of their economic power in socially irresponsible ways. As a member of the community, it is incumbent upon corporations to use their substantial economic power for the community good, rather than solely for self-enrichment, at the community's expense.

The need for a swift re-orientation of the corporate perspective to its community re-

The Service's emphasis is puzzling, since the Plaintiff had so modified its articles and operation that it could not (and does not) engage in proxy contests. Yet, the Service pointed to the Plaintiff's relationship with its sister organization (and citing indefiniteness of the roles of the two organizations' apparent common control, overlapping personnel, serving as its counsel, confusion concerning the relationship of proposed litigation and research programs)[22] as indication that the Plaintiff's purposes and intended operation contemplate a "substantial role in the carrying on and support of proxy contests." Ruling Letter at 28.

In its Motion for Summary Judgment, the Defendant's articulated three grounds for the Plaintiff's exemption denial: First, from August 14, 1973 until its termination, the Plaintiff's funds were used to support[23] Project operations, thus making it ineligible (a) because it was not operated exclusively for charitable purposes, and (b) its earnings inured to the benefit of a noncharitable organization, the Project; Second, the Center's litigation program did not conform with the guidelines of Revenue Procedure 71–39 in that it did not have a separate board to determine if its litigation was in the public interest and was "objective"; and Third, the Plaintiff does not meet the classification for a tax-exempt public interest law firm when it conducts suits involving noncharitable subject matter, i. e., those arising out of proxy contests. Defendant's Supplemental Memorandum in Support of its Motion for Summary Judgment, at 2. Despite the new "grounds" in the Summary Judgment Motion, the exemption denial is still founded on the ground that the Plaintiff participates in "non-charitable activities," by association, financial support or litigation.

The new arguments, numbers 2 and 3, are without any basis in the law, not to

sponsibilities is imperative, The general public is in no financial, organizational or power position to undertake the task with any effectiveness. The key to re-orientation lies with corporate management. They are responsible for the day to day operations and the policies of the corporation. Management is in turn "technically" controlled by the shareholders through the power of their vote.

At vote time, management submits its proposed plans and policies to the shareholders, and asks the shareholders for their proxies. If a shareholder does not give his vote to management's proposal, it could be available for an alternative proposal. If management fails to undertake the reorientation on its own accord in its proposals, there needs to be alternative proposals to promote socially responsible programs and policies. As the majority of shareholders in large corporations vote by proxy, the proxy solicitation is crucial to the direction of management.

Granted that even if alternative proposals are made, one cannot guarantee they will be voted in. But the questions will have been raised, the shareholders will have been educated to the wider horizon, and the seed may have been planted for future change that will require the corporation to assume some of its duties as a member of the community. The beneficiary of this activity and educational process to promote socially responsible corporations will be the public. There is a "community benefit." IV Scott on Trusts, Sec. 375.2 at 2715 (2d ed. 1956).

*As the Court views them, proxy contests appear to be the more direct and effective instrument of achieving the Plaintiff's purposes, and when conducted in the public interest, as the Plaintiff has done, they are charitable activities, in that they are the instruments (both legal and not against public policy) by which the charitable purposes are accomplished for the public good.* See, Rev. Rul. 72–599, 1972–47 IRB 8. Edward Orton Jr. Ceramic Foundation, 56 T.C. 147 (1971).

22. The Defendants draw these characteristics of the Plaintiff's relationship with the Project based on their reading of a memoranda published by the Plaintiff, but which the Defendants obtained from a third party, entitled The Center and Project on Corporate Responsibility: Where We Stand, 1973. See Defendants' Ruling Letter, May 16, 1973 at 29. Even after a careful re-reading of the Memorandum (hereinafter, Memo: Here We Stand), the Court is unable to see where the Defendants found "indefiniteness of roles" or confusion concerning the relationship of proposed litigation and research programs.

23. The Defendants conducted a six-week audit of the Plaintiff and the Project to provide support for this point.

mention the fact that since they were not raised in the Ruling Letter, they could not have been the basis for the exemption denial. Litigation in the public interest is a recognized charitable activity. Rev.Proc. 71–39, 1971–2 Cum.Bull. 575. Those public interest law firms which meet the requirements of Section 3 of Revenue Procedure 71–39 are entitled to an Advance Exemption Letter. The Plaintiff met every guideline and is, and was, entitled to an advance ruling letter.

The three requirements which the Defendants now say the Plaintiff's public interest litigation program failed to meet,[24] appear to have been created for this case. Nowhere does Revenue Procedure 71–39 require: "objectivity" in suit selection, a separate "independent" board to govern policies and programs, or that the subject matter of the suit involve charitable activities. What the Revenue Procedure 71–39 does say is that the area of representation may be in some specific area of public concern or "more broadly upon any subject of public interest as determined by the applicant." Sec. 2.01 (emphasis added). This language does not say that only those suits whose subject matter involves charitable activities will be recognized as public interest litigation, nor can it be read to require "objectivity" of an undefined nature. There has been no allegation that the suits, undertaken since the Plaintiff's reorganization, have not been in the public interest or have not met the spirit and letter of Revenue Procedure 71–39. Furthermore, under Sec. 3.05 of the Revenue Procedure, the only requirements of the board which is responsible for the policies and pro-

grams of the organization is that it be representative of the public interest, and that it not be controlled by employees or persons who litigate on behalf of the organization or by any organization that is not itself a § 501(c)(3) organization. The Plaintiff's sixteen member Board of Directors meets these criteria. See, Memorandum: Here We Stand, *supra*, at 16–17. There has been no allegation that it is not representative of the public interest. And without affirmative proof to the contrary, it is impossible to infer that four Board members who are also employees "control" the Board.[25]

The Plaintiff's litigation program so obviously meets the guidelines of Revenue Procedure 71–39, it appears that the Defendants were grasping at straws when they raised points two and three. As it has been said before, the Plaintiff's relationship with its sister organization, who can carry on proxy contests: their interlocking directorate, sharing of personnel and office space, is what the Defendants relied upon to make their initial denial. Evidently the Service envisons the Plaintiff and the Project as one entity since they have the same purposes and goals, and participate in several of the same type of activities (education and research)[26] to achieve those goals.

The Defendants admit, however, the fact that a charitable organization is affiliated with a non-charitable organization is not necessarily fatal to charitable qualification. Ruling Letter at 28. The Service permits interlocking directorates and overlapping personnel, between a charitable organization and its noncharitable affiliate. See, Rev.Rul. 54–243, 1954–1 Cum.Bull. 92; Rev.Rul. 58–293, 1958–1 Cum.Bull. 146; Rev.Rul. 63–252,

---

24. The Defendants have found no fault with the Plaintiff's other activities: their educational and research activities to promote corporate responsibility, as stated in both the supplements to the Plaintiff's application and in the Memorandum: Here We Stand, *supra*.

25. If any entity is to be considered controlled in the Plaintiff/Project relationship, the more logical conclusion would be that the Plaintiff controls the Project.

26. A complete description of the Plaintiff's and the Project's policies, programs and activities is set out in the Memo: Here We Stand, *supra*, and the Affidavits of Susan Gross, Phillip Moore, Philip C. Sorensen, and Allen Zerkin attached to the Plaintiff's Response to Defendant's Motion for Summary Judgment of October 26, 1973.

1963–2 Cum.Bull. 101; Rev.Rul. 66–79, 1966–1 Cum.Bul. 48.[27] The Plaintiff and the Project are two separate organizations: separately registered, separate bank accounts and holding themselves out as separate entities.[28] If interlocking directorates and overlapping personnel do not destroy the separateness of a charitable organization and its non-charitable affiliate, then the fact that the Plaintiff may represent the Project in the litigation aspect of its activities does not make the two entities one. It has long been recognized that a solid demarcation line is drawn between an attorney and his client in the attorney-client relationship.

There remains one final point which the Defendants use to justify the Plaintiff's exemption denial. Like all of the other grounds which have been advanced, this one is also without a legal basis even assuming the Defendants' allegations are true.

The Defendants maintain that the Plaintiff has financially supported the Project and its activities. They have two alternative arguments as to why this justifies disqualification for exemption: Such support allows the Plaintiff's tax-free revenues to enrich a non-charitable organization, or in the alternative, such support contributes to proxy contests, which are non-charitable

activities, and thus the Plaintiff is not operated exclusively for charitable purposes.

As evidence of their allegation, the Defendants have attached exhibits collected in a six-week audit of the Plaintiff and the Project covering the period from August 14, 1972, to July 31, 1973. Assuming the Defendants' factual allegations are true, $89.16 is the amount that the Plaintiff has contributed to the Project's benefit in the first quarter of 1973.[29]

The Defendants' Revenue Rulings as well as case law clearly permit charitable organizations to contribute their proceeds both to individuals, Rev.Rul. 56–304, 1956–2 C.B. 306;[30] Rev.Rul. 72–559, 1972–2 C.B. 247; and to non-charitable activities in the furtherance of its charitable purposes; Rev.Rul. 73–313, 1973–30 I.R.B. 15; Rev.Rul. 71–29, 1971–1 C.B. 150; Rev.Rul. 62–78, 1962–1 C.B. 86; Edward Orton, Jr., Ceramic Foundation, 56 T.C. 147 (1971). Not only is the amount that the Plaintiff contributed to the Project so miniscule, particularly in comparison to overall expenditures of $80,000 plus, but any contribution to the Project's activities would be in furtherance of the Plaintiff's purposes as both seek the same goal—increased corporate social responsibility. There has been no allegation

27. A noteworthy example of permitted interlocking directorates and personnel between a tax-exempt and non-tax-exempt organization is the set up between the American Civil Liberties Union and its tax-exempt affiliate, the ACLU Foundation. Both have the same directors and corporate officials. The Board of the ACLU governs the expenditure of the Foundation's tax exempt funds, determines the Foundation's programs and policies which are carried out by ACLU personnel. Affidavit of Alan Reitman and exhibit, attached to Plaintiff's Brief to Support Motion for Summary Judgment. The ACLU's case presents far greater interlocking of directors and overlap of personnel than exists in the Plaintiff's/Project's situation.

28. See, Memo: Here We Stand, *supra.* Center On Corporate Responsibility Proposal for Support, August 1972, Defendant's exhibit 25, attached to Defendant's Brief in Support of Motion for Summary Judgment.

29. The Plaintiff admits this amount is in contention based on an analysis of the Affidavits filed with the Defendants' Motion for Summary Judgment and the Plaintiff's October 26 Response. The Defendants have not denied this. The Plaintiff's total expenditures from January 1 to July 31, 1973 amounted to $84,764.87. The Plaintiff alleges that the great preponderance of these expenditures occurred during the first quarter of the year since due to the Plaintiff's acute financial crisis staff salaries were terminated on March 15, 1973 and the expenditures thereafter dropped radically. See Plaintiff's Reply to Defendants' Supplemental Memorandum, November 15, 1973.

30. From the sample of the Plaintiff's records the Court sees in the Defendants' exhibits the information requested in Rev.Rul. 56–304 is available in substance from these records though maybe not in form.

that the Project has done anything other than pursue its purposes in good faith. The complaint is with the means the Project uses to achieve those goals. The means that the Project has used to attain these goals differ from those of the Plaintiff in one principal respect—the use of proxy contests.[31] Even if the Defendants remain steadfast in their determination that proxy contests are not charitable activities (see footnote 21, *supra*), in light of the holdings and clear language of Revenue Rulings 73–313, 72–559, and 71–29, *supra,* and *Orton, supra,* this is irrelevant to the exemption question. The means employed by the charitable organization to achieve its purposes do not make the end results uncharitable. So it is in this case. Proxy contests are the instruments, both legal and not against public policy, which can be used to achieve the Plaintiff's purposes.

Assuming, however, for the sake of argument, that proxy contests cannot be considered charitable activities. The Plaintiff's contribution to an organization conducting activities not in the furtherance of the Plaintiff's exempted purposes has been so insubstantial [32] that this is a totally insufficient argument to legitimize an exemption denial. Treas.Reg. § 1.501(c)(3)–1(c)(iv). *See,* Better Business Bureau of Washington, D. C., Inc. v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945); Monterey Public Parking Corp. v. United States, 321 F.Supp. 972, 975 (N.C. Cal., 1970), aff'd., 481 F.2d 175 (9th Cir. 1973); St. Louis Union Trust Co. v. United States, 374 F.2d 427 (8th Cir.

1967); Dulles v. Johnson, 273 F.2d 362 (2nd Cir. 1959); Seasongood v. Comm'r., 227 F.2d 907 (6th Cir. 1955).

Taking all of the Defendants' allegations at their face value and examining them in light of Treasury Regulations and Rulings as well as the case law, it is self-evident that the Defendants' exemption denial is without basis in the law. The Plaintiff has met the requirements necessary for exemption status and is entitled to a refund of the employment taxes it paid in the first quarter of 1973. Furthermore, since the Plaintiff's purposes and activities were the same throughout the period of the audit, as it was the first quarter of 1973, the ruling letter's denial of exemption had no more legal basis than the denial of the refund.

## IV. THE COURT HAS THE POWER TO GRANT THE PLAINTIFF INJUNCTIVE RELIEF UNDER THE STANDARD OF ENOCHS v. WILLIAMS PACKING & NAVIGATION CO., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).

As further relief, the Plaintiff seeks to enjoin the Defendants from failing to classify the Plaintiff as a tax-exempt organization entitled to receive tax deductible charitable contributions under § 170(c), on the grounds that the Plaintiff needs this assurance to receive sufficient contributions to survive. Should their relief be limited to a refund of employment taxes, the Plaintiff maintains it is without adequate remedy at law, as there is no guarantee that the Defendants will consider the Plaintiff eligible

---

31. During the period covered by the audit, the Project undertook three principal activities (1) research concerning the feasibility of a mutual fund investor awareness program, which never materialized, (2) the Shareholder Joint Action Program, which the Defendant even characterizes as a program for educating the individual shareholders as to the levels of corporate responsibility of those corporations in which they hold stock and the means to achieve a greater degree of corporate responsibility. (Defendant's brief at 13) and (3) their proxy contest activities. The Project is also empow-

ered to engage in lobbying activities to attain its goal. This aspect of the Project's activities has been dormant.

32. The Defendants' examples of support (from August, 1972 through July, 1973) fall in the following categories: seven incidents of paying a bill part of which allegedly should have been allocated to the Project; partial allocation of salaries in the final months of 1972; refund of a phone bill payment; payment of employees' insurance; allocation of rent; and two appearances before legislative committees.

to receive deductible contributions for those years subsequent to the ones involved in this litigation (First quarter 1973).[33]

■ The Court finds that under the standards of Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 82 S. Ct. 1125, 8 L.Ed.2d 292 (1962), the Court has jurisdiction, to enter an injunction to prevent the Defendants from denying the Plaintiff its tax exempt status for as long as its operations do not conflict with its amended exemption application. The Court's finding does not preclude the Defendants from examining the Plaintiff's future operations and revoking this exemption on the proper grounds.

■■ The anti-injunction statute, 26 U.S.C. § 7421(a)[34] does not bar equitable relief where the case comes within the ambit of the *Williams Packing* exception, *supra*. The central purpose of the statute is to prevent judicial interference in the collection of lawful revenues. 370 U.S. at 7–8, 82 S.Ct. 1125. Therefore, if the assessment has any legal foundation, litigation prior to the collection would interfere in the prompt legal collection which the statute seeks to prevent. The twofold criteria of *Williams Packing* provides for an exception which does not collide with the statute's central purpose. For the taxpayer to maintain a suit under *Williams Packing* (s)he must show not only irreparable harm but (s)he must also demonstrate that under no circumstances could the Government ultimately prevail.

■ In this suit, the Plaintiff has fully demonstrated the illegality of the collection, irreparable injury and extraordinary circumstances. To deny the Plaintiff an equitable remedy in this case leaves it at the mercy of an all-powerful government without an adequate remedy at law. Granting injunctive relief in this case in no way burdens the government, and provides the Plaintiff with its only remedy at law.

It in no way burdens the government with litigation as the government would have been involved in litigation in this case in any event. The case was properly before the Court as a suit for refund of the payment of social security taxes. Determining the question of whether the Plaintiff was eligible for a refund involved the basic issue: whether the Plaintiff is a tax-exempt organization. Once the question is decided here, and the Plaintiff's operations continue as represented in the amended application, then the question is *res judicata* in all other suits regarding the issue of exemption for this Plaintiff conducting these activities. Thus there can be no additional litigation burden placed upon the Defendant.

Nor does the injunctive relief interfere with the prompt collection of legal revenues. Since the Plaintiff is entitled to exempt status under the law[35] and as long as the Plaintiff continues to maintain its operations in accord with its representations in its amended exemption application, the government is not legally entitled to collect revenues from it. If there is no legal entitlement to revenues, then a suit to prevent collection of those revenues cannot be a suit interfering with the collection of legal revenues, as forbidden by the statute.

**33.** Paragraph 270 of the Internal Revenue Service Exempt Organizations Handbook requires the successful litigant to re-establish its eligibility before the Service will recognize it as exempt and list it in the Cumulative Listing of Organizations Described in § 170(c) of the Internal Revenue Code.

**34.** The sister statute of § 7421(a), 28 U.S.C. § 2201, empowers federal courts to grant declaratory relief "except with respect to Federal taxes." This provision has been construed to bar declaratory relief only in those tax cases in which injunctive relief would likewise be barred. Americans United, Inc. v. Walters, 155 U.S.App.D.C. 284, 477 F.2d 1169, 1176 (1973), cert. granted, 412 U.S. 927, 93 S.Ct. 2752, 37 L.Ed.2d 154 (1973); McGlotten v. Connally, 338 F.Supp. 448, 453 (D.D.C.1973).

**35.** See Section III, *supra*, discussing the lack of a legal basis in the IRS's denial of exemption.

Finally, since there is no possibility that the government will ultimately prevail on the exemption question as long as the Plaintiff's operations continue as outlined in the amended application, injunctive relief is essential to prevent irreparable harm to the Plaintiff. If the Plaintiff must be limited to a suit for refunds it will be irreparably harmed. It will have to re-establish its eligibility to receive deductible contributions each taxing period. It will be forced to incur heavy burdens in both time and money in repeated litigation. But more importantly, the Plaintiff will suffer the ultimate irreparable harm of probable extinction. Without the requested injunctive relief the Plaintiff will have no guarantee of receiving deductible contributions under § 170(c). These constitute the Plaintiff's life-blood. Without them, the Plaintiff more likely than not will suffer the same fate it did on July 31, 1973. No suit for a refund can recoup this loss, or repair this harm.[36]

The extraordinary circumstances of this case provide an additional basis for the understated need for injunctive relief. Overlooking for the moment the admitted fact under Rule 37(b)(2)(A) that the Plaintiff was denied a favorable ruling because it was singled out for selective treatment for political ideological and other improper reasons which have no basis in the statute and regulations (See Section III, *supra*) other factors indicate that the Defendants did not have "clean hands" in their dealings with the Plaintiff. The application underwent an extremely protracted processing period, despite the Defendants' knowledge of the Plaintiff's pressing need to obtain a ruling as quickly as possible to be able to continue its operations. The Plaintiff had indicated repeatedly its willingness to modify its operations to conform to the Defendants' requests and requirements. In fact, the Plaintiff had made all the changes that the Defendants' representatives specified were necessary to receive exempt status. After the application was amended, the Plaintiff again and again requested that the Defendants' representatives contact it if further modifications were necessary, or if the Plaintiff's application presented any legal problems to the Defendants. The Plaintiff was never informed of any problem with its application.

Furthermore, the decision of the usual review panels was to issue a favorable ruling. That was the decision, until the personal intervention of the Chief Counsel and his Deputy, both political appointees. The Plaintiff's file was referred to another IRS employee who was not within the exempt corporations branch, had not been previously involved in the case, and was not under the direct supervision of the Chief Counsel. This employee made the first draft of a negative ruling in the case. Working at home after work, she prepared an eighty-plus page ruling letter in less than a week's time. This draft was used as the basis of the final IRS ruling issued on May 16, 1973. This was not the ordinary or usual treatment of tax exemption applications.

In this suit, the Plaintiff has fully demonstrated that it fits the exception to 26 U.S.C. § 7421(a) as specified in *Williams Packing*. Therefore, the Court is empowered to render equitable relief. The Court finds that the facts and circumstances of this case require that the Court enjoin the Defendants from denying the Plaintiff's recognition as a § 501(c)(3) tax-exempt organization entitled to receive tax deductible contributions under § 170(c), so long as it maintains its operations according to its representations in its amended application.

The Court shall enter this day an Order in accord with this Opinion.

---

36. Loss of tax deductible contributions has been recognized as irreparable harm. *E. g.*, Bob Jones University v. Connolly, 472 F.2d 903, 906 (4th Cir. 1973).

## APPENDIX

MEMORANDUM TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT REGARDING THE DENIAL OF EXECUTIVE PRIVILEGE INVOKED IN THE INSTANT CASE

Upon review of the four documents submitted by Mr. J. Fred Buzhardt for *in camera* inspection with the claim of executive privilege[1] this Court finds that the claim is not proper and that the documents are properly discoverable. The Court submits this statement of reasons for its findings to the United States Court of Appeals for the District of Columbia Circuit in accordance with the instructions of that Court in Nixon v. Sirica, 487 F.2d 700, at 721, No. 73–1962, 73–1967, 73–1989, decided October 12, 1973.[2]

The documents in question consist of memoranda between White House staff members relating to the recommendations and attempts to use the Internal Revenue Service in a selective and discriminatory fashion against those tax-exempt organizations which express opposition to the policies and programs of the Administration.

In determining whether the claim of executive privilege is applicable in this case, the Court has weighed the need and relevance of the documents against the disruption to the decision-making processes within the President's office by the disclosure of confidential documents. The suit involves the alleged misconduct of perversion of power by government officials. The documents provide evidence of such allegations and are therefore relevant to the adjudication of this suit. Wood v. Breier, (D.C.,

1972) 54 F.R.D. 7, at 12, and cases cited therein. To prevent discovery in such circumstances under the claim of executive privilege would allow the White House to cover up all evidence of its corruption and perversion of power when the Court is investigating such abuses. Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 391, 463 F.2d 788, 794 (1971). The Court, therefore, finds the documents are properly discoverable, and requests your instruction and direction in the premises.

---

1. The question of whether the claim of executive privilege was properly raised in this case has been discussed in the Court's opinion of December 11, 1973. For the purposes of this statement, the Court has treated the claim as improperly invoked.

2. The Court of Appeals has not indicated whether all determinations regarding White House claims of executive privilege must be certified to that Court for immediate sealed review or whether the certification procedure of Nixon v. Sirica is applicable solely to the unique circumstances of that case and the matter sought to be discovered—presidential conversations.