Nikolaas "Kallie" KNOETZE, Plaintiff,

v.

The UNITED STATES of America, the Department of State, Cyrus Vance, Secretary of the Department of State, the Immigration and Naturalization Service of the United States, Mr. Gullage, Acting Director of Immigration and Naturalization Service, Miami, Florida, the United States Marshal, all Deputy Marshals for the Southern District of Florida, all other Enforcement Officers for the Above Agencies or their Agents, and the Attorney General of the United States, Defendants.

No. 79–113–Civ.–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

March 16, 1979.

---

Ryan, Ryan & Fitzgerald, North Palm Beach, Fla., for plaintiff.

J. V. Eskenazi, U. S. Atty., Miami, Fla., for defendant.

ROETTGER, District Judge.

THIS CAUSE is before the court on the petition of plaintiff Nikolaas "Kallie" Knoetze for a permanent injunction. Plaintiff, the number-two ranked heavyweight challenger in the world and a native of South Africa, seeks a permanent injunction against the revocation of his visa by the Secretary of State, Cyrus Vance. The Immigration and Naturalization Service also refused to grant his application for a change of nonimmigrant status to an H-class visa, which would have permitted him to work in this country, solely on the basis relied upon by the Secretary of State in revoking the visa under 8 U.S.C.A. § 1201(i) on January 8, 1979.

The Secretary of State bottomed his revocation upon an admitted conviction of plaintiff in South Africa. The South African charge against plaintiff was "attempt-

ing to obstruct or impede the process of justice" while a policeman. This had been felt by the U. S. Consul in Johannesburg to be a misdemeanor falling within the petty offense exception of the Immigration and Nationality Act, 8 U.S.C.A. § 1182(a)(9); consequently, the B–1/B–2 visa was issued December 14, 1968. On review the Secretary of State determined that the offense corresponded to a felony rather than a misdemeanor and revoked the visa. No notice, which 22 CFR § 41.134(b) requires "if practicable", of the proposed revocation was given plaintiff nor did the government make any attempt to claim that the giving of notice was impracticable.[1]

Plaintiff contends that the action of the Secretary of State in revoking the visa (1) was legally incorrect in that the South African offense in question merely corresponds to a misdemeanor rather than a felony; (2) that there was impermissible political interference exerted upon the Secretary and the Department of State officials in making the determination; and (3) he was denied equal protection of the law.

## PROCEDURAL HISTORY

Suit was filed on January 10, 1979, before plaintiff had actually received notification of the revocation by the State Department. Plaintiff alleged that he had been advised by the news media that revocation was imminent. Notice was given to the United States Attorney's office in the Southern District of Florida on that day and an emergency hearing was scheduled for Orlando, Florida on the next afternoon, January 11th, 1979.[2]

At the hearing the court received certain documentary exhibits as to the revocation and heard argument of counsel. The court issued a restraining order on the authority of *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir.

---

1. Inasmuch as plaintiff's whereabouts were readily ascertainable by reading the sports pages, the lack of such contention is understandable.

2. The hearing was held in Orlando, although it is not in the Southern District of Florida, because the undersigned judge was attending a Judges' Workshop for United States District

Judges of the Fifth Circuit which was in progress in Orlando. The hearing was held in the United States Courthouse in Orlando through the hospitality of Chief Judge Young and Judge Reed. No objection was made by either party to the holding of the emergency hearing in Orlando.

1961). In the *Estrada* case petitioner had a nonimmigrant visa but the District Director of the Immigration & Naturalization Service refused to admit the visa holder into the United States. The petitioner sought a mandatory injunction against the Director of the Immigration & Naturalization Service in Miami permitting their entry into the United States. The District Court dismissed the complaint for lack of jurisdiction and the Fifth Circuit Court of Appeals reversed and remanded for a hearing. In view of the fact that an alien who is inside the United States and holding a visa has greater rights than one who is holding a visa and is seeking admission to the United States, the rationale of *Estrada*, contained in footnote 2 at page 692, compelled the issuance of a temporary restraining order in order that plaintiff could present his arguments in the District Court. See also, *Lennon v. Immigration & Naturalization Service*, 527 F.2d 187, 195 (2d Cir. 1975).

■ At the hearing on January 22 the court concluded that plaintiff had been afforded no opportunity to develop the question on the issue of the impermissible political interference; consequently, the hearing was continued for those purposes only until Friday, January 26.[3]

■ At the January 26 hearing plaintiff presented his evidence consisting of depositions of various persons in the State Department because the intervening time of four days did not permit much discovery by the parties. The government then moved to reopen on the first issue and presented an expert on South African law who had been contacted by the government for the first time on the previous day. The court granted the motion but pointed out to counsel that fairness required that plaintiff be given an opportunity to locate an expert on South African law of his choosing. The government refused to stipulate to the continuation of the status quo under the restraining order[4]; consequently the court sua sponte announced that it would reach a decision on the issue of preliminary injunction first and granted it on January 31.[5]

## REVIEWABILITY OF REVOCATION BY SECRETARY

■ A threshold question exists whether plaintiff is entitled to judicial review of the Secretary of State's decision to revoke his visa. The Immigration and Nationality Act vests the Secretary with authority to revoke an alien's visa and grants the Secretary leave to exercise his authority "at any time, in his discretion." 8 U.S.C. § 1201(i). Based upon this language, it is possible to argue that Congress intended either to prohibit judicial review of the Secretary's deci-

---

3. The temporary restraining order, with notice, expired on the date set for the consolidated final hearing on January 22, 1979 (January 21 fell on a Sunday). The court extended the temporary restraining order without objection of either party for ten days. Neither restraining order was set forth on a separate document but announced from the bench, the first because of the emergency nature of the proceeding and the lateness of the hour. Neither party has objected and any defect is considered waived.

4. An argument could be made by the State Department, although the court doubts its validity, that upon the expiration of the restraining order plaintiff's one year visa expired forever and that he would have to reapply for a visa. The court is fully aware that the non-issuance of a visa by a Consul anywhere in the world is not reviewable by any United States Court. E. g., *Estrada v. Ahrens*, 296 F.2d 690 at n. 2 (5th Cir. 1961). Any person smart enough to be a Consul in Johannesburg, or elsewhere, is smart enough to figure out the decision the State Department would like the Consul to make, especially in view of the dressing-down given by the Department to the Consul in a cable.

5. The final hearing was held on February 9 with final memoranda due on February 16 with the intention that the final ruling would issue in a few days. The government's final memorandum was filed on February 20 and on February 21 the New York Times published an unsigned editorial expressing its opinion about what the decision should be—based on facts totally different from the evidence contained in the State Department file. The court apologizes to the parties for the delay but the court promptly stopped working on the decision for a week because of the editorial for an obvious reason: lest the court appear to be influenced by the Times' vaunted reputation if the decision were for the government or to be antagonized by its blatant timing if the decision were for plaintiff.

sion to revoke a visa or to commit such decision "to agency discretion by law," 5 U.S.C. § 701(a)(2), within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* thereby rendering the decision non-reviewable.

The court begins with "the presumption that an administrative act is subject to judicial review unless there is a persuasive reason to believe Congress decided to deny review." *Graham v. Caston,* 568 F.2d 1092, 1096–97 (5th Cir. 1978). The permissive phrasing of the provision granting the Secretary authority to revoke visas hardly constitutes an express prohibition of review. *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969). Defendants thus bear the heavy burden of overcoming the presumption of reviewability by presenting convincing evidence that it was the intent of Congress to preclude review. *Alameda County v. Weinberger,* 520 F.2d 344 (9th Cir. 1975); *Fekete v. U. S. Steel Corporation,* 424 F.2d 331 (3rd Cir. 1970); *Guerrero v. Garza,* 418 F.Supp. 182 (W.D. Wis.1976). Defendants have offered no evidence of congressional intent and have not met their burden of proof.

The exception to reviewability in cases of acts "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is narrow in nature. It is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply' ". *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). In the instant case the court finds that the Immigration and Nationality Act read as a whole presents a body of applicable law which cannot be ignored by the Secretary in regard to aliens already admitted to this country. It thus subjects the Secretary's decision to revoke the visa of such aliens to judicial review.

The court's holding that the Secretary's decision in this case should be and is subject to review is strengthened by the fact that the Secretary chose not to follow the procedures established in regulations adopted by the Department of State for the revocation of visas. Those regulations require that notice of a proposed revocation and opportunity to oppose said revocation be given "if practicable." 22 CFR 41.-134(b). There has been no evidence that the giving of notice and an opportunity to be heard was impracticable in the instant case. The Secretary's contention that consular officers, but not himself or assistant secretaries, are obliged to follow the Department's regulations is rejected by the court. In these circumstances even if the Secretary's authority in the case was non-reviewable his failure to comply with his department's regulations would subject his decision to review. *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Graham, supra,* at 1097.

Finally, even if any debate existed as to the foregoing principles, where plaintiff has colorably raised the issue of impermissible political interference, reviewability of an agency decision is apparently required under *Lennon v. Immig. & Naturalization Service,* 527 F.2d 187, 195 (2d Cir. 1975), also, *Center on Corporate Responsibility, Inc. v. Shultz,* 368 F.Supp. 863 (D.D.C.1973). Although *Lennon's* requirement of review is only dictum and from another circuit, the court feels the procedure it suggests is persuasive. True, the court could stay this proceeding while plaintiff followed the traditional review pattern of appealing to the Board of Immigration Appeals, with direct review in the Fifth Circuit, but the issue raised of impermissible political interference would remain unless Knoetze prevailed. And *Lennon* suggested expeditious handling in the District Court of such claims. The fact that the traditional review process might exhaust the nine months left on plaintiff's visa dictated, in this court's judgment, that the issue be resolved. The court is unaware whether plaintiff has pursued an appeal to the Board of Immigration Appeals.

## WHAT TRIGGERED STATE DEPARTMENT'S ACTION

The State Department's file was introduced by stipulation and revealed the fol-

lowing chronology of events leading up to the action of the Secretary of State, through the Assistant Secretary of State, of revoking plaintiff's visa:

Apparently what triggered this entire chain of events were two messages of December 14, 1978 from SWAPO[6] to the U.S. Mission at the United Nations, one seeking the release of six leaders of SWAPO recently detained by South Africa and the other message dealing with South African boxers Knoetze and Goetzee, which claims (erroneously) that Knoetze killed a young man as a policeman. The SWAPO message re Knoetze continues "we are looking forward to the Honourable Secretary of State for intervention to prevent desperate racist agents from competing on your soil."

The SWAPO messages were contained in two cables of December 16, 1978, from the United States Mission to the United Nations to the Secretary of State with an in-full copy to the Embassy in Pretoria among others.[7]

On December 19, 1978 a dispatch was sent from the American Embassy in Pretoria to the Secretary of State in connection with two South African boxers although the context was devoted almost exclusively to plaintiff. The body of the dispatch discusses two separate charges against Knoetze in the preceding year, one of a shooting of a black youth in Atteridgeville, in which Knoetze was absolved of any guilt. The second charge is the one which is the basis for the State Department's revocation although the dispatch incorrectly asserts that Knoetze attempted to persuade black persons not to bring charges against a policeman; in fact, they were white, as revealed in subsequent documents.

By a letter dated December 15, 1978 a staff assistant for the "Southern African Project" of the Lawyers' Committee for Civil Rights under the law had written the Secretary of State requesting a denial of visa to Knoetze. The letter contains a number of inaccuracies and apparently was received in the Department on the 19th of December; a number of notations, mostly illegible, are contained on the letter as to action taken.

There is no documentation contained in the file or evidence of other activity in the intervening time until the 28th of December. On the afternoon of the 28th the second barrel was triggered: Landon Butler, an assistant in Hamilton Jordan's office at the White House, called Under Secretary of State Benjamin Read and told Read he had directed the Rev. Jesse Jackson to get in touch with Read about Jackson's concern about the Knoetze case. Read knew nothing about it at that time but responded that he would be glad to receive a telephone call from Rev. Jackson. Rev. Jackson called Read during the evening of the 28th around 7:00 P.M. or 8:00 P.M. and a meeting was set for the 3rd of January. Read had not met or talked with the Rev. Jesse Jackson prior to that time.

Two cables were sent on the 29th from State to Pretoria seeking a translated copy of the statute and the court record under which Knoetze was convicted.[8]

On Saturday, the 30th of December a cable was sent from the American Embassy in Pretoria to the Secretary of State; it inquired whether State had checked with INS (Immigration and Naturalization Service) concerning an application of Knoetze for a change of status to permit him to fight.

On January 2, 1979 Mr. Black of INS advised Devlin (of State) that if Knoetze is a bona fide boxer he would generally have

---

**6.** SWAPO (Southwest Africa People's Organization) seeks the establishment of the nation of Namibia out of Southwest Africa, now governed by South Africa.

**7.** The cables recited the SWAPO messages in full and, curiously inasmuch as the Secretary of State was the receiver rather than the sender, directed certain action be taken at various U.S. embassies in compliance with the SWAPO request in the cable not dealing with the boxers.

**8.** Throughout the file and particularly in this cable there are repeated reference to the applicability of note 1.4 of 22 CFR 41.91(a)(27). This particular cable adds "the Department regrets that Post did not recognize applicability of note 1.4 of 22 CFR 41.91(a)(27) in this case given political and social sensitivity re human rights."

Examination of the note and regulation reveals it is totally inapplicable to Knoetze.

no difficulty in receiving approval of a petition for an H–1 visa to permit him to fight in the United States. Black also advised that INS would have grounds for declining adjustment of the visa *only* if State advised INS that this visa was issued in error and that grounds of ineligibility existed.

On January 3, 1979, a meeting was held for an hour among the Rev. Jesse Jackson, Carl Holman (the President of the National Urban Coalition), Under Secretary of State Benjamin Read, Assistant Secretary of State Barbara Watson, Carl Shepherd (Chief, Advisory Opinions Division in the Visa Office of the Department of State), and several associates of the Rev. Jesse Jackson.

Under Secretary Read assured Rev. Jackson that a wire had been sent to Pretoria— implicitly from his answer and also from the chronology of events in response to the call from Jordan's office on the 28th about the appointment to be made with Rev. Jackson. Under Secretary Read described the meeting's essence: the concern of Rev. Jackson about the shooting and maiming of a 15-year old youth in a Soweto township incident in 1976; that Jackson felt the Administration's Human Rights Policy had no meaning if persons such as Knoetze were allowed entry; that it was wrong for Knoetze, with his background, to be issued a visa and have this "sort of promotion and gainful employment"; and that Rev. Jackson's views about South Africa's apartheid were discussed. Read did not mention any discussion with Rev. Jackson of the charge that was the ultimate basis for revocation.

## MATERIAL AVAILABLE TO THE STATE DEPARTMENT PRIOR TO REVOCATION

### A. Favorable to Knoetze

The State Department had available at the time of the visa's revocation a report from the Police Commissioner of Johannesburg about the shooting of a black youth at Atteridgeville, which revealed that Knoetze was one of several policemen there under the command of the Warrant Officer sent to help quell a riot of black youths. The youths had fired a municipal beer hall and attacked the police; then the Warrant Officer gave the order to his men to fire warning shots. The shots were fired by the police officers either into the air or at the ground and one bullet ricocheted from the ground and struck a black youth in the leg. All the police were found not guilty because there was no proof that any particular police officer hit the youth. The Police Commissioner added that Knoetze was known on the police force for having special sympathy for blacks and for a record of having helped many blacks out of difficulties.

Johannesburg had also cabled the Department as to the inquiries it had made of various South African jurists as to the Knoetze offense: Judge C. S. Margo, of the Supreme Court of the Transvaal Division; Advocate (similar to "barrister" in the British system) Isie Maisels, who is not only a Johannesburg practitioner but also Chief Justice of the Botswanna Supreme Court [9]; Advocate Sydney Kentridge who was the Advocate for the Biko family in the Biko incident; and attorney ("solicitor" in the British system) Victor Mansell. All agreed that there are no distinctions between felonies and misdemeanors in South African common law (derived from the Roman-Dutch law) and that although obstructing the course of justice can be a serious offense there is a range of gravity with Knoetze's crime "coming at the lower end". More serious offenses would entail tampering with a witness, attempting to influence a judge, etc.

---

**9.** The Government's expert on South African law Philip Hare, testified that Maisels was the outstanding advocate in South Africa and he had the greatest respect for him. In addition, he also testified that judgeships in South Africa were awarded to advocates on the basis of their ability and noted that Maisels was Chief Justice of Botswanna. Botswanna is a neighboring and stable Black government which opposes South Africa's policy of apartheid. The witness did not expressly say so but the inference is clear that apparently Maisels has not been appointed to the bench because his views do not square with the South African government's.

Kentridge said he would equate Knoetze's offense with a "misdemeanor" in the United States law; [10] Maisels said that the magistrate could have imposed a sentence of five years but the magistrate's imposition of a relatively light fine indicates that his actions were extenuating; Judge Margo said that Knoetze's offense was "unquestionably a misdemeanor" and that imposition of a "nominal fine" was testimony that the particular offense was "not serious" as traffic fines were often larger. In addition, if the matter had been serious the magistrate could have remanded the case to a higher tribunal (the Supreme Court).

### B. Material Used For Revocation

The facts most favorable to the decision of revocation which were before the State Department at that time were photocopies of pages 1113 thru 1117 inclusive of a treatise's treatment on defeating or obstructing the course of justice. The pages are from Gardiner & Lansdown, *South African Criminal Law and Procedures* (6th Ed., 1957) "Defeating or Obstructing the Course of Justice". This edition has been superseded. The treatise points out it is more common to charge the attempt. A number of instances are set forth in the textual treatment, but none are precisely on point with the allegations about Knoetze's offense. The material set forth in the photocopies is identical to that contained in a cable from Johannesburg on the 5th of January.

State's cable from Johannesburg indicated that "Knoetze was charged because he attempted to persuade the parents of a white youth (not black) to drop charges of common assault against two South African policemen. Apparently, Knoetze knew the parents and asked that they drop charges

against the two policemen on the ground that convictions would harm their career." The cable continued: "The police officer investigating the common assault charge became aware of Knoetze's attempt to have the charges dropped and proceeded to charge Knoetze with attempting to defeat the course of justice." Knoetze was convicted and fined 150 rands, (one rand equals 1.15 dollars) [approximately 175 U.S. dollars at the time]. Not unexpectedly, some of this information is not precise, but that is the information State had available for its decision to revoke plaintiff's visa.

### INFORMATION ABOUT SOUTH AFRICAN OFFENSE SUBSEQUENT TO REVOCATION

It is not the function of the court to re-try the South African case. However, what happened in the South African proceeding has some bearing on the question of whether the State Department exercised its discretion freely or whether it acted as an instrument of impermissible political interference.

Information obtained subsequent to the revocation revealed that Officer Bosch, a sparring partner of Knoetze, was the police officer investigating a stolen car. Bosch charged two white youths with the auto theft and apparently hit one (or both) as well. The parents then charged Bosch with assault; Knoetze intervened in behalf of his friend and attempted to have the parents drop the charges.

From testimony subsequently introduced there were four charges against Knoetze, three of them were simple assault matters and they were in addition to the instant charge. When a policeman is charged, the Attorney General in South Africa does not

---

**10.** The defendant's expert witness on South African law, Jerald Josman, testified that Kentridge is one of the most eminent barristers in South Africa, a pre-eminent civil rights' advocate, who has an international practice. Kentridge not only represented the Biko family in the legal proceedings going into the highly publicized and tragic death of the young black leader, Biko, but Kentridge had also taught at Harvard Law School for approximately six

months about 4 or 5 years ago. This tour at Harvard lends credibility to Kentridge's interpretation of the gravity of the offense under United States law but apparently it was not known by the State Department at any time prior to the final hearing in this case. Mr. Josman also opined that Kentridge would not adopt a chauvinistic attitude in giving his opinion.

delegate authority as to the manner of filing but exercises it personally. Because there were four pending charges, the Attorney General decided to have the case filed in the Regional Magistrate's court despite Knoetze's being a first offender. The three simple assault charges were separated out and Knoetze paid a fine (60. Rand total) without having to go to court, just as one in America can mail in a check to pay for a traffic offense without going to court.

It must be noted that simple assault charges are misdemeanors not involving moral turpitude and don't count against the visa holder under the petty offense exception of the Immigration Act. State knew about one assault charge at the time of the revocation decision, that one being when Knoetze stopped an off-duty fellow-policeman who had run a stop sign on his motorcycle. Knoetze hit him when the fellow-policeman became "cheeky".

After the guilty plea there was a discussion of a potential problem on Knoetze's part in getting future visas to the United States as the result of his offense. The Magistrate sternly lectured Knoetze and clearly set the punishment as high as it was because of Knoetze's status as a policeman. Although the government contended the harsh words of the Magistrate indicate the matter in South Africa was a very serious one and could not be considered as a minor offense, the court would remind government counsel of the at least equally stern lecture given by this—and presumably other American courts—to lawyers and accountants who fail to file their own income tax returns, which is only a misdemeanor.

Apparently, there is no technique for plea bargaining in South African courts as we know it in America so Knoetze chose to plead guilty to the charges.

The court personally abhors the policy of apartheid in South Africa. But the court must pause to point out that the testimony of the two expert witnesses on South African law, now practicing in America or preparing to do so, and the language of the Magistrate show a deep, refreshing devotion to the law on their part. So does the action of the Attorney General in South Africa in holding a policeman to a high standard of accountability, even for an offense of striking a fellow policeman who had ignored the law.

The government objected to any questioning of plaintiff Knoetze about his trial in South Africa or any events leading up to the charges. The court permitted the questioning and would have sustained the objection; however, an answer by the government's expert witness on South African law, Philip Hare, at a later session of the final hearing caused the court to consider one or two answers.

Knoetze was asked if the charges against him included an allegation for the use of bribery, intimidation or threats of force and his reply was in the negative. This matter, of course, is ascertainable from documentary exhibits. When asked if he in fact used bribery, intimidation, force, or threats of force against the parents of the youth in the Bosch case, his answer was a guileless and sincere: "No, your Honor, I didn't." The question was asked by his counsel, but the court was watching Knoetze very closely and the expression on his face, especially an instantaneous smile that passed over his face, left the court convinced that Knoetze did not bribe, intimidate or try to intimidate the parents of the youth in asking them to drop the charges. He testified that he asked them to drop the charges against Bosch because Bosch already had his last warning in the South African police force and he was trying to "help my friend". He emphatically said that he told the parents that they had "the last say" about whether to drop the charges and that they had to decide whether they wanted to drop them or not. Knoetze's answer was so sincere and so earnestly given that it troubled the court greatly when the government's expert, Philip Hare, answered that if the facts had been as Knoetze testified to, he doubted that charges would have been brought.[11]

11. Although the court recognizes the perils of even considering the possibility of re-trying foreign prosecutions in determining American visa matters and doesn't intend to do so, it is most

On January 23rd State requested an English translation of the indictment in the Knoetze case and his plea. On that same day it was cabled back to State from Pretoria. The indictment charged that Knoetze attempted to convince two persons (one parent of each of the respective youths who had charged Officer Bosch as their assailant) not to identify Bosch on an identity parade at the police station.

The alternative charge was that he "enticed" the parents to "defeat the ends of justice by trying to convince them to advise their children to withdraw certain charges of assault against David Bosch." The indictment itself actually charges that Knoetze, while being near the Central Police Station in Pretoria, "falsely claimed [to the parents] that he was the investigating officer on the mentioned cases of car theft and that he had influence over the result of the abovementioned charges and through word and/or deed tried to convince the abovementioned parents to advise their children to withdraw the charges against David Bosch so that David Bosch would not be prosecuted on the charges."

To these specific charges defendant entered a plea of guilty. The matters charged in the indictment are, of course, far more serious matters than the information available to State at the time the decision was made to revoke Knoetze's visa. Additionally, they are far more serious than the facts set forth in Knoetze's testimony.

## WHAT TEST SHOULD BE APPLIED

In *Soetarto v. Immigration & Naturalization Service*, 516 F.2d 778 (7th Cir. 1975), the court followed the formula set forth in *Giammario v. Hurney*, 311 F.2d 285 (3d Cir. 1962) in determining first if the substantive

offense for which the immigrant was convicted abroad is a misdemeanor or a felony. The opinion continued: "[t]he standards to be applied in making this determination are those of United States law." 516 F.2d at 780.

In *Soetarto* the petitioner had been convicted of two offenses of larceny in the Netherlands and contended that they were misdemeanors. The *Soetarto* court looked to the District of Columbia code as an expression of Congressional intent; that Code provides that if the value of the property stolen exceeds $100, the crime is grand larceny, which carries a possible sentence of more than one year. It is therefore a felony rather than a misdemeanor. 18 U.S.C. § 1(1). Soetarto's two offenses in the Netherlands involved thefts of $135 and $100. The opinion is unclear whether the second offense was more or less than $100 but the determination is unnecessary because the theft of $135 would constitute a felony under the District of Columbia Code. That conclusion obviated petitioner's benefiting from the "petty offense" exception of 8 U.S.C. § 1182(a)(9) [Sec. 212(a)(9) of the Immigration and Nationality Act].

Of particular interest to this court is the fact that a concurring opinion was filed by Circuit Judge Rives, Senior Circuit Judge of the Fifth Circuit, who concurred with reluctance because the sentencing judge had imposed such lenient punishment as to indicate the probable existence of certain extenuating circumstances. He opined that " . . . deportation without an exhaustive inquiry into the facts and circumstances of the two thefts and into the question of whether Soetarto had been completely rehabilitated leaves undetermined whether or not a just result has been reached." *Id.* at 781.

disturbing to consider that the harsh penalties of revocation and deportation, even under a non-immigrant visa, can be visited upon someone for a proceeding against that person in a country that (1) makes no distinctions between felonies and misdemeanors, as in American law; (2) considered it a lenient matter and thereby equivalent to a misdemeanor under American law; and (3) the facts as testified to

by Knoetze left the court convinced it is unlikely that a United States Attorney would take the matter to a grand jury or prosecute on a felony basis in America for attempting to persuade family acquaintances to drop charges against a good friend where no force or intimidation or bribery were used and where the final decision was left up to the parents about whether or not to drop the charges.

No case has been found from the Fifth Circuit dealing with the precise question.[12] In a more recent decision than *Soetarto* or *Giammario*, the Ninth Circuit Court of Appeals in *Patel v. Immigration and Naturalization Service*, 542 F.2d 796 (9th Cir. 1976), expressly refused to follow *Giammario* and *Soetarto* in the following language from footnote 5:

"5. We do not accept the rule first applied in *Giammario v. Hurney, supra*, and adopted in *Soetarto v. United States*, 516 F.2d 778 (7th Cir. 1975), that 'actual punishment' is determined by looking to the maximum possible penalty which could be imposed under an equivalent federal statute. *Barde v. United States*, 224 F.2d 959 (6th Cir. 1955), cited as precedent in *Giammario* and *Soetarto* involved very different facts and issues and does not support the use made of it." *Id.* at 798.

The court observes that the standard of "actual punishment" used for deportation is not expressly set forth in the petty offense subsection of the Immigration Act in connection with revocation of visas; therefore, arguably the rationale in *Patel*, otherwise sound in this court's judgment, does not apply to revocation of visa situations.

If this court were deciding which test should be applied, the legal trail forks: this court is left with a split of the circuits and no controlling decision from the Fifth Circuit.

■■■■■■■ The trail suggested by Judge Rives and *Patel* would appear the better one for the following reasons: *Patel* is more recent; the question of grand or petit larceny in *Giammario* and *Soetarto* is easily translatable into United States law, whereas the South African case is not easily translatable: e.g., Chapter 73 on obstruction of justice in U.S.C., Title 18 has eleven

sections, five of which are misdemeanors (§§ 1501, 1502, 1504, 1507 and 1508) and the rest are felonies; Judge Rives suggested an exhaustive inquiry into the facts and circumstances of the prosecutions in a foreign country in his concurring opinion in *Soetarto*; although Congress has plenary power in the area of deportation Congress must be presumed to expect courts to consider equitable matters rather than reflexively applying rigid tests (See e. g., *Lennon*); and it is settled doctrine that deportation statutes must be construed in favor of the alien. *Immigration & Naturalization Service v. Errico*, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1969); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 68 S.Ct. 374, 92 L.Ed. 433 (1948).

■■■■■ The obvious Congressional purpose of subsection 212(a)(9) of the Immigration and Nationality Act is to keep persons who are likely to be undesirable residents or sojourners from being in our midst. Federal decisions have applied the tests rather rigidly, with minimal, if any, equitable considerations. Often judges are clearly uncomfortable in such decisions; for example, see Judge Rives' opinion in *Soetarto*, supra; Judge Eisele, dissenting and citing similar opinions, in *Marciano v. Immigration and Naturalization Service*, 450 F.2d 1022 (8th Cir. 1971). (The majority didn't appear to be much more comfortable in deporting a citizen for a crime of statutory rape when it would not have been a crime in 27 of the 50 states.) Rarely has a court looked at the problem and concluded that Congress would not want the court to impose the harsh consequences of deportation by strict interpretation, such as the majority concluded in *Lennon*.

However, this court is confining its consideration to the issue of impermissible po-

12. Apparently only one case has been decided in the Fifth Circuit on a similar question. *United States ex rel. McKenzie v. Savoretti*, 200 F.2d 546 (5th Cir. 1952) involving a different statute.

The appellant was convicted of forgery and stealing and sentenced to serve three years at hard labor. Although the Court of Appeals rejected the contention that an inquiry be made into the pertinent law of the British West Indies as he claimed the offenses were committed while he was a juvenile and that a juvenile court had not been set up in the British West Indies, the court did hold that Immigration officials and "and courts sitting in review of their actions need only to look to the record and the inherent nature of the offense." *Id.* at 548.

litical interference, as set forth in *Lennon, supra.* To expand this case into a determination of the test to be applied would possibly give plaintiff two appellate bites at the same apple. Whether State followed a reasonable legal test is a factor for the court to consider on the question of impermissible political interference but whether the test followed is the preferable law is not before this court.

### POLITICAL INTERFERENCE

That brings us to the issue raised by plaintiff of impermissible political interference. Almost no law exists dealing with this charge of impermissible political interference. The authority for this court's considering this issue is the extremely strong dictum in *Lennon v. Immigration & Naturalization Service,* 527 F.2d at 195 (2nd Cir. 1975). Even the dissenting judge concurs as to the issue of political interference in the *Lennon* case. The Court of Appeals considered the claim of John Lennon, one of the Beatles, that his conviction in the United Kingdom for the possession of marijuana should not cause him to be excludable and therefore deportable under 8 U.S.C. § 1182(a)(23).

The court's majority determined that there was minimal gain in effective enforcement by deportation and concluded that it " . . . cannot imagine Congress would impose the harsh consequences of an excludable alien classification upon a person convicted under a foreign law that made guilty knowledge irrelevant." *Id.* at 194. However, the court continued that if it had not determined that Lennon's contention was correct on appeal it would have directed the District Court to proceed expeditiously with further proceedings on Lennon's claim that he had been selectively prosecuted because of political grounds. Lennon made the charge that he was being deported because he would participate in demonstrations that would be highly embarrassing to the then-existing presidential administration. *Id.* at 190. He also charged that the agency had violated its prior practice and consequently abused its

discretion, a charge implicit in these proceedings in connection with the lack of notice. *Ibid.*

Unfortunately, the opinion in *Lennon* provides this court with no landmarks in considering the charge of impermissible political interference other than the court's observation that: "The courts will not condone selective deportation based upon secret political grounds." *Id.* at 195. So at this point the legal trail ends and there are no tracks to guide the court.

This court continued the proceedings for a period of four days during which plaintiff was compelled to travel to Washington and seek to depose various persons in support of its charge of impermissible political interference. The Government was very accommodating to plaintiff and made several individuals available. Essentially, the charge was that the White House intervened with the Department of State to set up a meeting with the Rev. Jesse Jackson, head of operation PUSH, and also Carl Holman, President of the National Urban Coalition. Mr. Shepherd testified that after the meeting he worked extensively on the case, including through the coming weekend, to prepare the legal opinion supporting the revocation and also the letter of revocation. The court's findings on what led up to the revocation have been set forth earlier.

But what showing is necessary for the court to determine whether there has been impermissible political interference? Clearly there must be access to members of the Executive Branch by citizens who are troubled by matters in which they have a legitimate concern. The First Amendment protects the voicing by Rev. Jackson, Mr. Holman and others of their displeasure with actions of the government, as well as their attitudes towards South Africa's policies.

The witnesses from the State Department stoutly deny there was any political pressure placed upon them by the White House. However, political pressure is rarely as overt or crass as a bribe; even extortion can be accomplished by innuendo. 31 *Am.Jur.*2d, Extortion, Blackmail, and Threats § 10 and cases cited therein. A

suspicion of impermissible political interference would hardly exist if, for example, there was a meeting between the leaders of the AFL–CIO and officials of a Republican administration or, conversely, between officials of the National Association of Manufacturers and the typical Democratic administration. But unquestionably Rev. Jesse Jackson and Carl Holman, President of the National Urban Coalition, are two of the three or four most prominent Black Leaders in the United States. It is a safe conclusion that political analysts, with the possible exception of Messrs. Scammon and Wattenburg, would consider that the Black political strength for Jimmy Carter was the key factor in his election to the presidency in 1976. This factor raises more than a suspicion of political interference: at least an inference of political interference is implicit in such a situation.

A phone call from the office of the man closest to the President can hardly be brushed aside as a mere call of introduction. One need only recall the columnists' discussions in the aftermath of Watergate of the power of a junior White House aide who calls an agency with the introduction: "This is the White House calling. . . ."[13]

In the instant case the phone call from Hamilton Jordan's office was hardly innocuous. It arranged a meeting on short notice with an Under Secretary and an Assistant Secretary of State. Testimony is clear that Rev. Jesse Jackson later called Under Secretary Read a half-dozen times about this matter.

The Government offered the testimony of an expert on South African law on January 26 but the expert had only been contacted by the State Department the day before. At that same hearing it also offered the translated transcript of testimony of the proceedings in South Africa involving plaintiff despite the fact that the State Department had not received the translation until January 24, 1979. Curiously, the Government contends that its not having such materials during the decision-making process in early January does not support the charge of impermissible political interference.

A number of factors may be summarized, mostly chronologically, which show the Extent of the political interference: (1) in February, 1978 Knoetze received a temporary visa to come to the United States to be a spectator at the Ali-Spinks fight in Las Vegas. Ambassador Bowdler was not in South Africa but at the United Nations and the Department of State called him personally about Knoetze's visa application; then the Department advised Johannesburg it had no objection to the issuance. From the evidence 5 million visas are issued annually by the Department of State. One of the State Department officials claimed that Knoetze's case was handled exactly the same as if he were from any nation other than South Africa. Based on State's reaction both in February and December that assertion not only lacks credibility, it is laughable. (2) Both SWAPO messages received immediate action by the United States, one directing immediate compliance in connection with SWAPO leaders held in South Africa and the other accomplished the requested result with remarkable speed, especially considering the Christmas and New Year's holiday periods. (3) The White House set up the meeting on short notice between two of its major political backers and an Under Secretary and an Assistant Secretary of State. (4) What was discussed at the meeting was not the basis ultimately stated for the revocation, although it undoubtedly was the reason. (5) A rush to revocation ensued with less than a week before the revocation issued. (6) Ample material possessed by State that plaintiff was sympathetic to blacks and the opinions of eminent South African jurists and advocates—especially Maisels' and Kentridge's—that the offense was a misdemeanor were ignored by the Department. (7) No notice

---

**13.** From two years in the Washington bureaucracy this court remembers with some amazement the over-reaction on the part of career super-grades as well as career secretaries to a phone call that began "This is the White House calling. . . ."

was given to plaintiff of the proposed revocation despite its being required by State Department regulations.

## TEST OF IMPERMISSIBLE POLITICAL INTERFERENCE

Although the court in *Lennon* does not treat the issue of political interference in any detail it did indicate that Lennon's claim was entitled to expeditious relief in the District Court and the District Court should "accord him the relief to which he may be entitled. The courts will not condone selective deportation based upon secret political grounds." 527 F.2d at 195.

In *Center on Corporate Responsibility, Inc. v. Shultz*, 368 F.Supp. 863 (D.D.C.1973), the plaintiff charged that it was qualified to receive deductible charitable contributions under the Internal Revenue Code and that the Internal Revenue Service's issuance of a ruling that plaintiff was not exempt from federal income taxes and not qualified to receive deductible charitable contributions was based upon improper White House influence.

The District Court cited the evidence, the discovery problems, and the claim of executive privilege as to certain exhibits. The court concluded that the defendants failed to comply with the court's discovery orders and made an improper claim of executive privilege, which thereby precluded the court from determining the issue of political interference or intrusion. The court deemed the plaintiff's complaint established as to that issue.

However, the District Court at the beginning of its discussion on that particular issue set forth the test as: "A showing of political influence renders the Service's ruling null and void. It is outside the law." 368 F.Supp. at 871. The opinion continued: "The Court is concerned not only with direct political intervention, but also with the creation of a political atmosphere generated by the White House and the Internal Revenue Service which may have affected the objectivity of those participating in the ruling in the Plaintiff's case." *Id.* at 871.

At first blush the District Court's opinion appears to indicate that *any* showing of political influence would render the agency's ruling null and void. This court cannot go that far. In fairness, the District Court in the District of Columbia apparently would not have gone that far because later in the opinion this observation appears: "The Plaintiff has met all the requirements for exemption status and would have been entitled to a favorable ruling even if the fact of political intervention had not been established." *Id.* at 873. The court doubts that in *Center on Corporate Responsibility* the District Court would have held that political interference, however slight, is sufficient to constitute an impermissible political interference. In both *Lennon* and *Center* that precise question did not present itself and neither gave that precise holding.

The citizens of the United States of America have a right to expect the Executive Branch and the Legislative Branch to be free in their respective decision-making processes from impermissible political interference. This seems more critical than ever with the rapid rise of the single-issue pressure groups. In the Constitution the framers took steps to insure the Judicial Branch would be free of such pressures. It would be naive to assume that political influence and some political interference would not occur in the Executive and Legislative Branches of the Government. On balance, that may be necessary to keep a partisan political system operating. However, the key is whether the political interference is impermissible: did the pressure exerted result in an abuse of discretion? Did the Department of State give in to the pressure and make an untenable decision? State clearly went into high gear and when it couldn't rest the revocation on the shooting injury to the black youth, it found another peg to hang its decision on, despite the absence of material it now urges upon the court as supporting its decision.

However, with the existence of the *Giammario-Soetarto* test, even if less sound, and some similarities—albeit sparse from the materials available to State at the time

of its decision—between the offense in South Africa and 18 U.S.C. § 1503, this court cannot hold, without more, that the political interference rose to the level of impermissibility. This court will not intrude onto political territory that is the domain of the Executive Branch, absent very compelling evidence of impermissible political interference.[14] The court does not reach the question of whether tardily obtained supporting material would redeem a decision, which otherwise resulted from impermissible political interference.

The court must therefore deny the petition for a permanent injunction.[15]

DONE AND ORDERED this 16th day of March, 1979.

---

**14.** This memorandum opinion will constitute the court's findings of fact and conclusions of law in compliance with Rule 52.

**15.** After nearly thirty legal-size pages of this opinion a few moments of reflection causes the undersigned to reflect that a citizen could have analyzed this case in a couple of paragraphs. First, the political leader of a special interest group spends a political chip. And a political system responds politically. And for what: about a heavyweight fighter who's not Galahad. But hardly Ahab, either.

His problem is he's a South African who wants to fight for dollars, while most Americans want to acquire Krugerrands. If he were an American, whether his errant loyalty to a friend amounted to felonious conduct or only a misdemeanor would hardly bar his boxing progress. After all, heavyweights often aren't milquetoasts. And some of the American variety are felons. E. g., his opponent, Bill Sharkey, in the fight State tried to stop, spent several years in jail for manslaughter. And one doesn't have to be a fight fan to recall quickly other American felons recently in the heavyweight ring: Sonny Liston, Ron Lyle, and even Mahammad Ali—draft evasion is a felony.

One conclusion leaps from this case: If Knoetze hadn't fired a shot which ricocheted and hit a black youth during a riot, this matter would not have been singled out of 5 million visas issued annually for attention. Not by SWAPO, Rev. Jesse Jackson, or anyone else. And Knoetze would prove in an American ring whether he is worthy of a world title rather than slugging it out in the courts and the mire of Foggy Bottom.

If State ultimately prevails, who loses? Knoetze, to be sure. His possible opponents—Spinks, Norton, Holmes, Ali—would also lose. And if he is a great fighter, millions of American fight fans, black and white, also lose unless the satellite brings us the fights. If he isn't great in the ring, it won't matter. Except the Secretary of State has injected international politics into sports—one more time it has occurred in the world. It is another opportunity for some increase in international understanding wasted. Hopefully, in the future the Executive Branch will not continue to politicize international sports, as it did here.

It is the court's personal hope that Knoetze not only will be a great fighter but will also use his prestige to help eradicate apartheid.