**R.E. DIETZ CORPORATION,**
Plaintiff–Appellee,

v.

**UNITED STATES of America,**
Defendant–Appellant.

**No. 1438, Docket 90–6274.**

United States Court of Appeals,
Second Circuit.

Argued May 9, 1991.

Decided July 22, 1991.

**2**

Ernest J. Brown, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., Albany, N.Y., Gary R. Allen, Jonathan S. Cohen, Tax Div., Department of Justice, Washington, D.C., Shirley D. Peterson, Asst. Atty. Gen., Washington, D.C., of counsel), for defendant-appellant.

Thomas C. Buckel Jr., Syracuse, N.Y., (Gerald F. Stack, Martha L. Berry, Hancock & Estabrook, Syracuse, N.Y., of counsel), for plaintiff-appellee.

Before PRATT, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

The United States appeals from a judgment entered in the United States District Court for the Northern District of New York (McAvoy, J.), finding that R.E. Dietz Corporation ("Taxpayer") was entitled to a refund of taxes and interest overpaid for the years 1981, 1982 and 1983. Pursuant to section 7422 of the Internal Revenue Code and 28 U.S.C. § 1346(a)(1), Taxpayer commenced this action seeking a refund in the amount of $454,650.30 paid after the Internal Revenue Service ("IRS") determined that certain interest income earned by Taxpayer's controlled foreign corporation, R.E. Dietz Company, Ltd. ("Dietz"), in "offshore" bank accounts should be included in the gross income of Taxpayer under 26 U.S.C. § 951.[1] Dietz is a controlled foreign corporation as defined by I.R.C. § 957, because more than fifty percent of its stock is owned by Taxpayer. In the notice of deficiency, the IRS informed Taxpayer that interest income earned by Dietz in 1981, 1982 and 1983 was not income that Taxpayer was entitled to exclude from its tax return under former I.R.C. § 954(b)(4), which allowed for the exclusion of income earned by a controlled foreign corporation under certain circumstances.

After a two-day bench trial, the district court held that Taxpayer was entitled to the benefit of the exclusion under I.R.C. § 954(b)(4). The government's principal contentions on appeal are that the district court was required to defer to the IRS deficiency determination, setting it aside only if the IRS acted arbitrarily, and that the district court erred in finding that none of the significant purposes of establishing the "offshore" accounts included a substantial reduction in income taxes. We hold that the determination of the Commissioner that the Taxpayer was not entitled to avail itself of the exclusion under I.R.C. § 954(b)(4) may not be disturbed unless arbitrary or unreasonable. We also hold that, although the district court applied an erroneous standard of review, the record supports its conclusion that the Commissioner's determination was unreasonable.

## BACKGROUND

For about 140 years, Taxpayer has been engaged in the manufacture of lighting products with its operations centered in Syracuse, New York. At its inception, it manufactured lanterns and burners, expanding in 1896 to manufacture kerosene lanterns. At the end of the Second World War, Taxpayer began to manufacture automotive lighting products, although it continued producing lanterns for sales throughout the world, especially in developing and third world nations. Because of the political and economic climate following World War II in some of those developing nations and as a result of competition from

---

1. Hereafter all provisions of the Internal Revenue Code will be referred to as "I.R.C. § __."

other manufacturers, Taxpayer's business began to decline.

To offset declining profits in the mid-1950s, Taxpayer began to explore the possibility of setting up lantern-making operations in a foreign country. It selected Hong Kong to set up a foreign subsidiary for several reasons, including its abundance of unskilled labor, its status as the shipping and freight center of the Far East and the existence in Hong Kong of a free currency exchange, which greatly facilitated international trade. Dietz was formed and incorporated under the laws of Hong Kong on July 2, 1957 for the purpose of manufacturing and selling lanterns.

At the time of its formation, Dietz's largest market for the sale of lanterns was in the area formerly known as British East Africa. All lantern prices were quoted in and paid for in the British pound sterling. However, all local expenses, such as labor and materials, were payable in Hong Kong dollars ("HK dollars"). This made it necessary to convert to HK dollars all monies Dietz received from sales. After the collapse of the international monetary system of fixed currency exchange rates in the early 1970s, the British pound sterling declined in value and virtually disappeared as a major trading currency. Because more nations had United States dollars ("U.S. dollars") available, Dietz began to quote prices in U.S. dollars in the early 1970s.

By 1975, Dietz was receiving U.S. dollars for the sale of its products and immediately converting them into HK dollars to pay its current obligations. The conversion to HK dollars was uneconomical because HK dollars on deposit in Hong Kong banks were receiving little or no interest and, because the U.S. dollar was the stronger currency, Dietz was losing money in the exchange. Although most of Dietz's expenses were payable in HK dollars, an increasing portion, such as freight and sales commissions, was becoming payable in U.S. dollars. Thus, Dietz resolved to establish reserves of U.S. dollars to hedge against currency exchange losses and to enable it to pay shipping and freight commissions and other expenses in U.S. dollars.

Dietz opened a U.S. dollar account, paying 4½% interest, at the Hong Kong branch of the First National City Bank of New York ("First National"). In that account, not only were U.S. dollars on deposit earning a higher rate of return, but Dietz was entitled to overdraft privileges, enabling it to borrow money by overdrafting its bank accounts without providing any collateral. Dietz would pay its Hong Kong obligations in borrowed Hong Kong dollars, and, even though it had to pay interest on the overdraft loans, the expense was offset by the higher rate of interest earned on the U.S. dollar accounts. By the end of 1975, Dietz had a balance of $650,000 in the U.S. dollar account maintained at First National.

In 1976, Dietz resolved to increase its U.S. dollar reserves. At that time, Dietz established a U.S. dollar account at the Hong Kong branch of the Chase Manhattan Bank, N.A. ("Chase Manhattan"). The funds deposited in that account were used to purchase "Asian Currency Units" ("ACU") in Singapore for deposit in a Chase Manhattan branch there. U.S. dollars would be deposited in Hong Kong, and a book entry of the U.S. dollar amount would be made to Chase Manhattan's branch in Singapore, which paid higher interest. These accounts were called "offshore" accounts because the interest income was earned in a jurisdiction outside of Hong Kong. Hong Kong did not tax the income earned on ACU accounts, a fact that Dietz learned after establishing the accounts. In 1978, Dietz opened another offshore account with the Singapore branch of Chase Manhattan. Because of increased sales in deutsche marks, Dietz also opened an offshore account in that currency in 1981. Taxpayer had knowledge of the offshore accounts maintained by Dietz.

Beginning in the late 1970s through 1983, Dietz felt the effects of a world-wide recession. During this period, Dietz considered opening a new base of operations, setting aside $600 thousand (U.S. dollars) for this purpose. Dietz eventually opened a plant in the People's Republic of China ("China") in 1986. In any event, during

4

this recessionary period, Dietz continued to increase its U.S. dollar deposits in offshore accounts. Although it suffered a significant decline in sales during the 1981–1983 period, the offshore accounts enabled it to remain liquid and allowed it to hedge against further devaluations of H.K. dollars. In fact, Dietz learned from its accountants that it earned a profit for that period only as a result of the interest income earned in offshore accounts.

Throughout the same 1981–1983 period, Taxpayer suffered a serious decline in the sales of its automotive products. For that reason, it reported on its tax returns for 1981–1983 net operating losses of its own, which were carried back to the years 1979–1981. As mentioned previously, the IRS disallowed the claimed losses on the ground that interest income earned by Dietz during the years 1981–1983 was "foreign base company income," see I.R.C. § 954(a)(1), (c), and therefore was taxable as income of Taxpayer. In response to a notice of deficiency, Taxpayer paid the taxes, and subsequently on April 13, 1987 filed a claim for refund with the IRS. After six months elapsed without action by the IRS, Taxpayer commenced a lawsuit in the district court for a refund of taxes (and interest and penalties) allegedly overpaid for the years 1981–1983. After a two-day bench trial, Judge McAvoy held that Taxpayer was entitled to a refund.

## DISCUSSION

### I. The Standard of Review Identified

■ The government contends that the district court judge erred as a matter of law in "placing himself in the position of the Commissioner, as if he (the judge) were evaluating [T]axpayer's reasons for the ACU transactions." As the district court understood its role, it did "not sit in review of the determination by the IRS; rather as ... the trier of fact ..., [it had to] listen[ ] to and evaluate[ ] evidence so as to ultimately determine whether the taxpayer has proved by a preponderance of the evidence that the assessment is wrong." Thus, the district court made a de novo determination of tax liability based on the evidence

presented to it. The government maintains that, in this case, the district court should not have substituted its own determination for that of the Commissioner, but, rather, should have set aside the Commissioner's determination only if it was found to be arbitrary or unreasonable.

■ Ordinarily, in an action brought pursuant to 28 U.S.C. § 1346(a)(1) for a refund of taxes already paid to the government, the district court is required to redetermine the entire tax liability. Lewis v. Reynolds, 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932). The factual and legal analysis employed by the Commissioner is of no consequence to the district court. National Right to Work Legal Def. & Educ. Found. v. United States, 487 F.Supp. 801, 805 (E.D.N.C.1979); see also Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir.1987) ("courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment."); Kentucky Trust Co. v. Glenn, 217 F.2d 462, 465–66 (6th Cir.1954). "[T]he court does not sit in judgment of the Commissioner; the court places itself in the shoes of the Commissioner." National Right to Work, 487 F.Supp. at 805. Thus, a de novo review of the determination and assessment should be conducted. Ruth, 823 F.2d at 1094. Regarding the burdens of proof in a refund action, the notice of tax deficiency carries a presumption of correctness, requiring the taxpayer to demonstrate that the deficiency is incorrect. See Lesser v. United States, 368 F.2d 306, 310 (2d Cir.1966) (in banc decision on the burden of proof issue); United States v. Lease, 346 F.2d 696, 700 (2d Cir.1965). The taxpayer bears the burden of persuading the trier of fact that the assessment is incorrect. Pizzarello v. United States, 408 F.2d 579, 583 (2d Cir.), cert. denied, 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969).

■ Here, however, we are called upon to determine the standard of review in a refund action where the statute under which the assessment was made provides that the Commissioner must be satisfied that there was not one significant tax re-

duction purpose in engaging in the particular transactions. Section 954(b)(4), in force during the period at issue, provides:

> For purposes of subsection (a) [which defines the items of income included in "foreign base company income"], foreign base company income does not include any item of income received by a controlled foreign corporation if it is established *to the satisfaction of the Secretary or his delegate* that neither—
>
>> (A) the creation or organization of such controlled foreign corporation under the laws of the foreign country in which it is incorporated ..., nor
>>
>> (B) the effecting of the transaction giving rise to such income through the controlled foreign corporation,
>
> has as one of its significant purposes a substantial reduction of income, war profits or excess profits or similar taxes.

Pub.L. No. 91–172, § 909(a), 83 Stat. 718, *reprinted in* 1969 U.S.Code Cong. & Admin.News 509, 793 (emphasis added). The Commissioner is the "delegate" of the Secretary. *See* I.R.C. § 7701(a)(11)(B), (12)(A)(i). The district court found that "nothing in the language of the statute at issue ..., particularly the phrase 'establishes to the satisfaction of the Secretary,' warrants the imposition of [a] higher degree of proof." However, it is a cardinal principle of statutory construction that courts are required to give effect to every clause and word of a statute, if possible. *See United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). The language "to the satisfaction of the Secretary" must mean that some amount of deference be given to the conclusion of the Commissioner that tax reduction was a significant purpose in effecting the transactions under scrutiny. To conclude otherwise would render the phrase superfluous.

Taxpayer argues that the phrase, "to the satisfaction of the Secretary," is not the functional equivalent of a statutory grant of discretion to act, conceding that in those situations where the Commissioner is given discretion to act, our review of such action is limited. *See Thor Power Tool Co. v.*

*Commissioner*, 439 U.S. 522, 547–48, 99 S.Ct. 773, 788–89, 58 L.Ed.2d 785 (1979); *Your Host, Inc. v. Commissioner*, 489 F.2d 957, 960 (2d Cir.1973), *cert. denied*, 419 U.S. 829, 95 S.Ct. 51, 42 L.Ed.2d 54 (1974); *Roth Steel Tube Co. v. Commissioner*, 620 F.2d 1176, 1179 (6th Cir.1980). In *Gerli & Co., Inc. v. Commissioner*, 668 F.2d 691, 698 (2d Cir.1982), we were called upon to construe I.R.C. § 367, which provided that, unless "it is established to the satisfaction of the Secretary ... or his delegate that [the liquidation of a subsidiary] is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes," the liquidation of the foreign subsidiary corporation would be a taxable event. We held that under that provision "the Secretary's *discretion* was ... not intended to be limitless." *Id.* (emphasis added). Here, the Commissioner must be satisfied that a taxpayer meets the two requirements set forth in section 954(a)(4). Like the situation in *Gerli & Co.*, it is not a great leap to say that the Commissioner has discretion in determining whether the requirements are met.

The district court apparently believed that, because no record had been generated by the Commissioner, it was not required to review the Commissioner's assessment under an arbitrary and capricious standard. Even though the treasury regulations allow for an advance ruling as to whether the exclusion applies, *see* Treas.Reg. § 1.954–1(b)(3)(v) (redesignated § 1.954A–1, see 53 Fed.Reg. 27,492 (1988)), no advance ruling was sought. It is true that there was no record (or factual findings) to review, and the district court was required to make its own factual findings. Nonetheless, based on those findings, the language employed by Congress in excluding certain income from taxation requires the district court to accord a certain amount of deference to the Commissioner's assessment. The appropriate amount of deference is embodied in the arbitrary and capricious standard, which allows for the exercise of discretion, although not unbounded discretion. *See Gerli & Co.*, 668 F.2d at 698.

## II. *The Standard of Review Applied*

Subpart F of the Internal Revenue Code (sections 951–964) was enacted to deter taxpayers from using foreign subsidiary corporations to accumulate earnings in countries that impose no taxes on accumulated earnings. *Koehring Co. v. United States*, 583 F.2d 313, 317 (7th Cir.1978). Prior to the enactment of subpart F, no United States tax was imposed on the earnings of controlled foreign corporations ("CFC") in foreign countries until dividends were issued to the United States shareholders. Subpart F requires a United States shareholder to include in its income certain types of income earned by a CFC, even though undistributed, if such income exceeds ten percent of the gross income of the CFC. *Garlock, Inc. v. Commissioner*, 489 F.2d 197, 198 (2d Cir.1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2608, 41 L.Ed.2d 215 (1974); *see also* I.R.C. § 954(b)(3) (amended in 1986 by Pub.L. No. 99–514). Thus, the provisions eliminate the tax deferral benefits of the undistributed income earned by the CFC. *Koehring*, 583 F.2d at 317.

The provisions operate as follows: Under I.R.C. § 951, the gross income of a United States shareholder includes the shareholder's pro rata share of the CFC's subpart F income unless the income falls within the exclusion set forth in section 954(b)(4) of the IRC. Subpart F income is, in the case of a CFC, the sum of the foreign base company income. *See* I.R.C. § 952(a)(2). Foreign base company income is defined in part as "foreign personal holding company income," I.R.C. § 954(a)(1), which, in turn, includes "that portion of the gross income ... which consists of ... interest" earned by a CFC. I.R.C. § 553. As mentioned in the first part of this opinion, section 954(b)(4), as amended in 1969, excluded from the shareholder's gross income interest income earned by a CFC, if it is proved to the satisfaction of the Commissioner that neither the creation of the CFC, nor the effecting of the transaction giving rise to the income had as one of its significant purposes a substantial reduction in income taxes. Both requirements of the exclusion must be met.

The government does not dispute that Taxpayer satisfies the first requirement of the exclusion, namely, that the creation of Dietz did not have as one of its significant purposes a substantial reduction in income taxes. *See* Treas.Reg. § 1.954–1(b)(3)(iv). The only dispute, therefore, is whether one of the significant purposes of the effecting of the transaction giving rise to the interest income was tax reduction.

■ The government argued during oral argument, as well as in its reply brief, that a taxpayer cannot avail itself of section 954(b)(4) if the *effect* of the transaction is a reduction of income taxes. To the government, therefore, the purpose of a transaction is determined by its effect. However, the plain meaning of the provision does not support the government's contention. If the taxpayer proves to the satisfaction of the Commissioner that *none* of its *significant* purposes in carrying out the transaction was for income tax reduction, the exclusion should be available to the taxpayer. Yet, even if the taxpayer sustains this burden, the result—or as the government urges, the effect—of the transaction would be a reduction of income taxes. Therefore, based on the plain meaning of the provision, the government's contention must be incorrect. Also, even if one of the taxpayer's purposes in effecting the transaction was tax reduction, the exclusion, by its terms, will apply so long as the Commissioner is satisfied it was not a significant purpose.

The legislative history of the provisions at issue furnishes an additional reason for rejecting the government's contention. Although we need not consider legislative history where the meaning of a provision is plain, *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), which in this case it is, we turn to the legislative history to show that the government's contention is wide of the mark.

The Revenue Act of 1962, *see* Pub.L. No. 87–834, 76 Stat. 960 (1962), *reprinted in* 1962 U.S.Code Cong. & Admin.News 1128, added sections 951–964 (Subpart F income provisions) to the Internal Revenue Code. Section 954(b)(4), as it was originally enact-

ed, excluded from Subpart F income certain items of income received by a CFC,

> if it is established to the satisfaction of the Secretary or his delegate with respect to such item that the creation or organization of the [CFC] receiving such item under the laws of the foreign country in which it is incorporated does not have the *effect* of substantial reduction of income ... taxes. (emphasis added).

Thus, under the 1962 provision, if the *effect* of a transaction, under the laws of the country of incorporation, was to reduce income taxes, the exclusion did not apply. The use of the term "effect" in the 1962 provision mandates that an objective analysis, focusing only on the outcome of a transaction, be utilized in determining the applicability of the exclusion. Our task would be at an end, and the government's contention on point, if the 1962 provision were under consideration. It is not. In 1969, Congress amended section 954(b)(4), and the provision as amended governs Taxpayer's obligations for the 1981–1983 period. Under the 1969 provision, the focus is on the significant purposes for executing the transaction (and for the creation of the CFC) rather than on the effect of the transaction.

■ The government maintains that the sole reason for the 1969 amendment was because of local laws requiring divestiture of a CFC's appreciated property. It relies on the Senate report accompanying the revised section 954(b)(4), which provides in relevant part:

> Cases have come to the attention of the committee where [CFCs] have substantial investments in the foreign country in which they are organized which they must dispose of because of the laws of the foreign country relative to permissible investments of foreigners. If that foreign country imposes little or no capital gains tax, then the exception in present law is not available with respect to the gain on the sale of the investments since there is a reduction of income taxes (relative to the tax which would have been paid in the United States were the transaction to occur here). This is true even though the corporation was not or-

ganized to reduce taxes and the purpose of the sale is to comply with foreign laws and not to reduce taxes.

S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin. News 2027, 2328. The government contends that forced divestiture, as discussed in the legislative history, is the only situation in which a taxpayer may avail itself of the safe haven provided under section 954(b)(4). However, we do not "require[ ] that every permissible application of a statute be expressly referred to in its legislative history." *Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 463, 112 L.Ed.2d 449 (1990). Simply because forced divestiture may have provided the impetus for the amendment, it cannot be said that Congress intended to foreclose the application of the exclusion to circumstances that fall squarely within its meaning.

Although we have concluded that the district court erred in failing to accord proper deference to the Commissioner's determination and assessment, as noted previously, the Commissioner's discretion is not limitless. At this juncture, we must determine whether it was arbitrary and capricious, and therefore unreasonable, for the Commissioner to conclude that one of the significant purposes of setting up the offshore accounts was a substantial reduction in income taxes.

The treasury regulations interpreting section 954(b) provide that "to be significant a purpose must be important, but it is not necessary that it be the principal purpose or the purpose of first importance." Treas.Reg. § 1.954–1(b)(3)(iii). Also, the treasury regulations direct that in making the determination as to whether a purpose is a significant one, "all the facts and circumstances ... be taken into account." *Id.* § 1.954(b)(3)(iv). "Among the factors to be considered are the various purposes for the action." *Id.*

■ The government argues that the district court impermissibly looked at Dietz's motivations or business reasons for establishing the offshore accounts. At the bench trial, the government stipulated that

Dietz had legitimate business reasons for structuring its bank accounts as it had. To the government, however, the motivations for setting up the accounts are irrelevant. It equates "purpose" with "intent," or with "what was meant to be accomplished by the transaction," while "motive" is equated with "reason for taking the action." Citing *Anderson v. United States*, 417 U.S. 211, 226–27, 94 S.Ct. 2253, 2263–64, 41 L.Ed.2d 20 (1974), the government maintains that the distinction is not simply one of semantics. This argument appears to us to be another attempt to equate "purpose" with "effect." We already have rejected that interpretation. In any event, in *Anderson*, a case involving a ballot-box-stuffing conspiracy in which petitioners contended that the primary motive behind their conspiracy was to affect the outcome in the local rather than the federal election, the Supreme Court did not distinguish motive from purpose—in fact, the Court used the terms interchangeably. *See, e.g.*, 417 U.S. at 225–26, 94 S.Ct. at 2262–63. Rather, the Court found to be irrelevant considerations of primary or secondary purpose or motive for purposes of criminal liability under 18 U.S.C. § 241.

The statute uses the term "purpose" and the treasury regulations allow for consideration of "the various purposes for the action." Recently, the Sixth Circuit, analyzing a similar provision, looked to the "motivations" underlying the decision to engage in a transaction in determining whether the taxpayer's principle purpose was to reduce income taxes. *See Tecumseh Corrugated Box Co. v. Commissioner*, 932 F.2d 526, 538 (6th Cir.1991). Other courts likewise have looked to underlying motivations or reasons in cases where the provision under scrutiny contained the term "purpose." *See Pescosolido v. Commissioner*, 883 F.2d 187, 190 (1st Cir.1989); *Fireoved v. United States*, 462 F.2d 1281, 1287 (3d Cir.1972). We thus arrive at the unexceptional conclusion that in interpreting the purpose in carrying out a transaction, it is permissible to look at reasons or motivations for the effecting of the transaction.

■ The evidence at trial overwhelmingly demonstrated that the purposes for establishing the offshore accounts had nothing to do with taxes and everything to do with survival in a depressed economy. In the mid–1970s, the offshore accounts were opened because Dietz needed to keep cash reserves of U.S. dollars to meet its obligations payable in U.S. dollars. It would have made no business sense to convert all U.S. dollars to H.K. dollars, to take a loss in the conversion and to earn less interest on the funds. The U.S. dollar accounts were necessary to hedge against currency exchange losses occasioned by extreme devaluations in H.K. dollars. For example, in January, 1981, the exchange rate of the H.K. dollar to the U.S. dollar was 5.19 to 1, respectively. In September, 1983, the exchange rate was 8.40 to 1.

During the 1981–1983 period, Dietz was suffering severe economic problems as a result of the world-wide recession. The evidence reveals that sales during that period decreased by about sixty percent. Because of plummeting sales, Dietz resolved to remain liquid, and to that end accumulated a great deal of money in its offshore accounts. Additionally, Dietz was considering the possibility of commencing operations in another location and set aside funds for that purpose. The fact that Dietz opened a plant in China in 1986 lends credence to the testimony that the accumulation of funds was for a purpose other than the reduction of income taxes.

Also prevalent at this time were concerns over the annexation of Hong Kong by China. After then-British Prime Minister Margaret Thatcher visited China to negotiate the return of Hong Kong to China, Dietz took steps to insure its future. One of the reasons that Dietz opened the offshore accounts was to secure the deposited funds, which technically were located outside of Hong Kong, from being appropriated by China. Additionally, the executive board minutes of Dietz establish that concerns over annexation also led to Dietz's decision to remain as liquid as possible. This policy would allow Dietz to set up operations elsewhere if the political and economic climate

in Hong Kong were no longer favorable for the business.

During 1982 and part of 1983, the Hong Kong tax treatment of interest earned on accounts maintained in foreign currency was the same regardless of whether the account was maintained in Hong Kong or in an ACU account. Dietz was not aware that the interest earned on the ACU accounts was free from Hong Kong tax when it opened the accounts, and it did not change its policies in 1983 and 1984 when Hong Kong began to tax the interest earned on ACU accounts.

It is apparent that the significant purpose for establishing the U.S. dollar accounts and the offshore ACU accounts was survival of the business during an economically tumultuous period. Even though Dietz knew that the accounts were exempt from local taxation, which it learned only after opening them, there is no evidence even suggesting that tax exemption was a purpose, let alone a significant one, in establishing the accounts. We hold, therefore, that it was arbitrary and capricious for the Commissioner to conclude that Dietz had any significant tax reduction purpose in setting up the offshore accounts.

## CONCLUSION

On the basis of the foregoing, we affirm the judgment of the district court.